UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NAZ, LLC                                    CIVIL ACTION

v.                                         NO. 17-2882

PHILIPS HEALTHCARE, A DIVISION OF          SECTION "F"
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION

ORDER AND REASONS

Before the Court is the defendant's Rule 12(e) motion for
more definite statement and Rule 12(b)(6) motion to dismiss or,
alternatively, for more definite statement.  For the reasons that
follow, the motion is GRANTED in part (insofar as the plaintiff
must amend its complaint to identify the citizenship of each of
its members) and DENIED in part (insofar as the plaintiff has
satisfied its notice pleading obligation with respect to its
allegations of the sale of the MRI and the defendant is not
entitled to a more definite statement).

**Background**

This litigation arises from a medical facility's purchase of
allegedly faulty MRI equipment, the manufacturer's allegedly
shoddy installation and service of the MRI equipment, as well as

1

its failure to provide the purchaser with the "complete package" including the hardware and software components that should have been delivered when the MRI equipment was installed.

This extensive factual summary is drawn from the allegations of the complaint. Philips Healthcare, a Division of Philips Electronics North America Corporation (Philips), designs, manufactures, tests, markets, sells, installs, and services medical and diagnostic equipment, including the Ingenia 3.0T Omega MRI.[1] Philips Medical Capital (PMC) is the financing arm of Philips, but Philips leads its customers to believe that Philips controls the financing terms of its equipment sales in order to coax sales.

NAZ, LLC owns a medical facility on Kingman Street in Metairie, Louisiana. The medical facility at 2909 Kingman Street was constructed to expand the existing medical center (2905 Kingman St.) with the addition of a state of the art neuroscience center and ambulatory surgery center. Critical to this expansion, the neuroscience center was to house an Ingenia 3.0T Omega MRI. Dr. Morteza Shamsnia, as principal of NAZ, decided that a new, state

---

[1] MRI, or magnetic resonance imaging, is non-invasive imaging technology that, using a large magnet and radio waves, produces three-dimensional detailed anatomical images of organs and structures inside the body.

of the art 3T MRI would provide better services to patients, would produce much higher quality MR images, would allow vast expansion of his research into subjects such as autism, dementia, Alzheimer's disease, concussions, post-traumatic stress disorder. Dr. Shamsnia decided, with the proper computer hardware and software equipment, it would expand the number and geographical reach of services, and thereby increase NAZ's revenue and profits.

After research and discussions with various manufactures, Dr. Shamsnia, on behalf of NAZ, decided to purchase the Philips Ingenia 3.0T Omega MRI neurological complete package. This complete package was crafted to serve NAZ's and Dr. Shamsnia's particular purposes for use of the machine. Philips marketed its product with promises and representations that the MRI package was the equipment needed to achieve the particular purposes sought by Dr. Shamsnia on behalf of NAZ.

In December 2011, relying on Philips' representations including those regarding the high level of skill, expertise, and knowledge possessed by Philips, its engineers, and installation specialists, Dr. Shamsnia signed a quote document that set forth the price and components, package, and services Philips promised to deliver. In doing so, Dr. Shamsnia (on behalf of NAZ) made a counteroffer to Philips' quote or proposal by adding to the terms

3

a condition that acceptance was contingent upon Philips providing financing for the purchase of the MRI at 3.9%. The effective dates of this quote document were December 11 and December 30, 2011.

Nevertheless, it is alleged, there was never a meeting of the minds as to this quote document, which was never fully executed. There remained disputes regarding the terms of the sale. Negotiations regarding the sale terms continued.

In May 2012, a Philips financial sales representative sent another "partial" quote document to Dr. Shamsnia, who countered by attaching additional conditions of the sale. Dr. Shamsnia noted on the quote that any agreement on the sale of the Ingenia 3.1T was conditioned upon Philips confirming its authority to lock in the financing terms previously requested by Dr. Shamsnia and made subject of a financing arrangement with PMC. No Philips representative ever signed this partial quote document and the Philips Standard Terms and Conditions of Sale were never sent or explained to Dr. Shamsnia. This partial quote document, which had the effective dates of May 14, 2012 to June 28, 2012, was never finalized and never became effective or binding on NAZ.

Negotiations between Philips and Dr. Shamsnia continued in an attempt to reach an agreement on the sale terms and conditions and on the services, instructions, and recommendations by Philips.

4

While the negotiations continued, because of the delays, Philips and NAZ agreed that Philips would deliver the Ingenia MRI package, and Dr. Shamsnia on behalf of NAZ agreed to follow Philips' experts' instructions and recommendations regarding installation and services.

Before the MRI package could be installed, the facility and room where it would be housed needed to be constructed and modeled according to Philips' experts' specifications. NAZ had expended significant costs to construct and model the second floor of its facility at 2909 Kingman Street based on Philips' experts' representations. But, after Philips' engineers visited the facility, they notified Dr. Shamsnia that, due to vehicular movement below in the medical facility's parking lot, the MRI package needed to be located on the third floor. NAZ then incurred additional costs to reconstruct the third floor of the facility to house the MRI package. NAZ relied upon Philips' engineers and installation specialists, who installed the MRI package and its components on the facility's third floor.

Dr. Shamsnia and his construction teams and Philips' engineers participated in weekly meetings, discussing in detail the issue of vibration and sound isolation. NAZ articulated its concerns regarding vibration and the support system for the MRI

unit.  Philips' experts showed photographs and told NAZ that the redesigned, special pads for 3T MRI units solved those concerns: the experts reassured NAZ that the weight of the unit and the special modified pads were adequate and safe to operate the MRI package and prevent its movement during operation.  Philips never mentioned the existence of anti-seismic brackets.

On December 22, 2014, the Philips' team released the MRI package to NAZ and represented that it was safe for patient use. At that time, Philips began to request monthly payments on the MRI package.  Dr. Shamsnia, on behalf of NAZ, began making payments to Philips' financing arm, PMC.  NAZ hired a board certified MRI technician, who was sent to Philips' headquarters in Cleveland, Ohio to receive training on the 3T Philips MRI before January 5, 2015.

The MRI use on patients and volunteers began on January 5, 2015 and continued for only four days.  When the technician returned on January 12, 2015, the technician noted improper signals during calibration as well as gaps and separation of the covers on the MRI unit.  Immediately, she notified Philips engineers.  That afternoon, a Philips engineer made a site visit and noticed these changes.  When the engineer opened the bottom cover of the MRI unit, it revealed a significant, clear shift and sliding of the

vibration pads from their originally installed location.  The MRI unit was inoperable and service was required to render it safe for operation.

Philips agreed to service the MRI unit, which was tendered to Philips' engineering team for modifications and repairs to allow Philips the opportunity to correct the faulty condition.  On January 13, 2015, Philips' senior engineers arrived at the facility and discovered that the MRI had moved inches from where Philips' engineers had originally installed it.  The engineers inquired about the possibility of an earthquake as the explanation for the movement.  After inspecting the unit, the engineers evacuated the facility based on their concern that the unit might explode.  They then "quenched" the MRI, which involved de-energizing the MRI and discharging it of all of the helium gas in the MRI system; the helium was released through a vent pipe on the roof.  The MRI was completely inoperable.

Two days later, NAZ employee discovered water from heavy rainfall the night before had entered through the roof and flooded the floors, walls, and ceiling of the MRI room, as well as the floors of the surrounding rooms.  It was later determined that Philips' engineers had caused an opening in the roof through which

the water entered the facility.  NAZ had to pay $850,000 to repair the damage.

Even after months of communication, Philips' experts could not determine the cause of the MRI's malfunction.  NAZ had to hire its own experts at its own expense.  NAZ's experts determined that the cause of the malfunction was the movement of the MRI in normal operation; the support system for the MRI equipment was inadequate, which caused the approximately 4,600 kilogram (10,000+ pound) magnet to move while the MRI was being used.  When Philips was notified of this discovery, it admitted that the support system it had recommended and installed was neither suitable nor safe.

NAZ then had to spend additional time and money to obtain additional equipment to repair the problem caused by Philips.  The parties agreed that this remedial work was subject to the oversight, direction, control, and approval of Philips' engineers and done according to Philips' specifications and modifications.  These included additional modifications to the door and the room in which the MRI was housed.  Given the continuing inspections, troubleshooting, repairs, reinstallation, and testing, the MRI equipment was not re-activated until after April 2016.  To date, the MRI equipment has never been recertified by Philips for clinical use.

Because the continuing repair, modification, reinstallation, and redelivery of the MRI equipment took so long, it was not until sometime after April 2016 that NAZ discovered that the computer software and hardware package component that should have been installed with the MRI equipment had not been installed. Because the software and hardware component of the MRI package was central to NAZ's agreement to purchase the MRI equipment from Philips at the particular price agreed upon, and because the computer component has not been delivered to this date, NAZ claims that Philips has failed to deliver the MRI package it purchased. NAZ claims that Philips' failure to properly install and configure the MRI equipment and because of the structural alterations of the building caused by Philips' actions, an application to the appropriate governmental agency for approval of the ambulatory surgery center cannot be initiated by NAZ, which has resulted in loss of use and profits.

To operate the MRI equipment for clinical use, Philips required NAZ to complete advance training, which did not occur until after May 2016. Certification for clinical use of the MRI equipment by the American College of Radiology was not obtained until August 2016.

On April 4, 2017, NAZ, LLC sued Philips Healthcare, alleging gross fault (because, as a manufacturer of highly complex medical diagnostic equipment, Philips should be held to a heightened standard of care from which Philips grossly deviated) and several breach of contract causes of action: breach of obligation to provide a complete system that would fit NAZ's particular purposes of which Philips was aware, in violation of Louisiana Civil Code article 2524; bad faith breach of contract in violation of Louisiana Civil Code article 1997; bad faith seller in redhibition, in violation of Louisiana Civil Code article 2520; failure to make timely deliver, in violation of Louisiana Civil Code article 2485; and breach of installation and service agreements. NAZ seeks to recover the following damages: purchase price and expenses occasioned by the sale; loss of business with respect to use of the MRI package; loss of business with respect to use of NAZ's surgery center; loss of profits with respect to use of the MRI package; loss of profits with respect to use of plaintiff's surgery center; loss of goodwill; costs and expenses incurred in relation to damages to the facility caused by the quenching of the MRI; loss of intellectual gratification and physical enjoyment of the MRI and ambulatory surgery center; inconvenience; financing costs and interest; costs incurred to mitigate damages and costs associated with repairs and testing of the MRI and MRI room; costs

incurred to mitigate damages or costs associated with repairs to and testing of the MRI and MRI room; costs incurred to preserve the MRI and related equipment; depreciation; overhead costs and expenses; in the event of rescission, return of the purchase price with interest from the time of the sale and all expenses incurred as a result of the sale; attorney's fees and litigation costs; and any and all penalties, punitive or exemplary damages, fines, fees, including treble damages afforded under Louisiana law.  The defendant now moves for a more definite statement as to the plaintiff's jurisdictional allegations and moves to dismiss, or alternatively, seeks a more definite statement regarding the plaintiff's claims arising from the alleged contract of sale.

I.

*A.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor.  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

11

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

13

complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011)(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

*B.*

Rule 12(e) allows a party to move for a more definite statement of a complaint when it is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e)(the moving party must "point out the defects complained of and the details desired."). Like other Rule 12 motions, Rule 12(e) motions are generally disfavored because of the liberal pleading standard articulated by Rule 8. See Mitchell v. E-Z Way Towers, Inc., 269 F.2d 126, 132 (5th Cir. 1959). Rule 12(e) motions should not be used as a substitute for discovery. Id. Rather, such motions should be used sparingly to remedy "a pleading that states a claim so vaguely or ambiguously that it cannot be answered." See Wright & Miller, Federal Practice and Procedure § 1376, at 315, 328 (3d ed. 2004)("The narrow range of application of Rule 12(e) and the recognition that many motions for a more definite statement are interposed largely for the purposes of delay, raises the question of its contemporary value. Some commentators and judges have advocated that the motion be abolished entirely,

thereby remitting parties who desire the clarification of a claim asserted against them to the discovery process.").

II.

*A.*

First, Philips seeks "a more definite statement" concerning the plaintiff's allegations supporting this Court's exercise of diversity jurisdiction. The defendant submits that the plaintiff has failed to identify the citizenship of each member of its LLC and, therefore, has failed to sufficiently allege that this Court has diversity jurisdiction. The plaintiff counters that it pled sufficient facts to allow the Court to infer that the parties are diverse, and that the identity and citizenship of its members is readily ascertainable by performing a search on the internet. The Court finds that the plaintiff's jurisdictional allegations are defective, but will permit amendment.

For diversity purposes, the citizenship of an LLC is determined by the citizenship of all of its members. <u>Harvey v. Grey Wolf Drilling</u>, 542 F.3d 1077, 1080-81 (5th Cir. 2008).[2] It

---

[2] The Fifth Circuit observed:

> Supreme Court precedent, case law from other circuits, and the statutory language of both Section 1332 and Louisiana Revised Statutes § 12:1301(a)(1) overwhelmingly support the position that a LLC should not be treated as a corporation for the purposes of

follows that a plaintiff invoking this Court's diversity jurisdiction must identify members of an LLC and allege each member's citizenship in order to sufficiently allege that the Court has jurisdiction.

Here, it is undisputed that the plaintiff made only conclusory allegations concerning diversity jurisdiction.[3] Simply put, the citizenship of an LLC is determined by the citizenship of all of its members; the burden is on the party invoking this Court's jurisdiction to sufficiently allege jurisdictional facts on the face of the complaint -- it is not for the Court to assume that all unnamed members of the plaintiff LLC are diverse from the defendant, nor is it for the respondent to consult resources outside of the complaint to search for jurisdictional facts.  When a party has the affirmative burden to allege particular facts within its knowledge, its burden is discharged when it explicitly pleads those facts.  See <u>Getty Oil Corp., a Div. of Texaco Inc. v.</u>

_____

diversity jurisdiction.  Rather, the citizenship of [an] LLC is determined by the citizenship of all of its members.

<u>Id.</u>

[3] The plaintiff alleges:  "This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendant are citizens of different states, and the jurisdictional amount...is met in that the amount in controversy exceeds $75,000."

Ins. Co. of N. Am., 841 F.2d 1254, 1259 (5th Cir. 1988)(Where "jurisdiction depends on citizenship, citizenship must be 'distinctly and affirmatively alleged.'"). However, because "[d]effective allegations of jurisdiction may be amended" pursuant to 28 U.S.C. § 1653, the plaintiff will be permitted to amend its complaint to specifically identify its members and their citizenship.

III.

The defendant moves to dismiss, or seeks a more definite statement regarding, the plaintiff's allegations relative to any alleged "sale" of the MRI equipment. The defendant identifies what it perceives as several deficiencies in the plaintiff's allegations. First, the defendant contends that the plaintiff fails to plead facts sufficient to identify the parties to the sale; the defendant submits evidence to support its belief that the true purchaser of the 3T MRI was Advanced Neurodiagnostics Center, not NAZ. Second, the defendant contends that the plaintiff fails to adequately plead the requisite elements concerning a valid sale under Louisiana law, in particular, that the plaintiff fails to properly plead "the parties' concurrence on the thing sold" and fails to plead the price it paid for the thing sold. The Court

17

disagrees; the plaintiff's detailed allegations amply satisfy the liberal pleading standard and policy of Rule 8, Twombly, and Iqbal.

Although the plaintiff alleges several different claims for relief, the defendant focuses its challenge on the allegations concerning its sale of the MRI equipment to the plaintiff. Louisiana Civil Code article 2439 defines a "sale" as "a contract whereby a person transfers ownership of a thing to another for a price in money.  A valid sale in Louisiana requires concurrence on three elements:  (1) the thing sold, (2) the price, and (3) the consent of the parties."

Viewing all well pleaded facts in the light most favorable to NAZ, the plaintiff alleges that Dr. Shamsnia, on behalf of NAZ, decided to and ultimately did buy from Philips the Philips Ingenia 3.0T Omega MRI neurological complete package, and that the transaction was financed through PMC.  Negotiations among Dr. Shamsnia and Philips were extensive and prolonged; there were many discussions and disputes regarding the terms of the sale, the financing of the sale, and the specifications of Philips' services, instructions, and recommendations.  Despite an impasse among NAZ and Philips on some terms and conditions of the sale, the parties performed, or began performing their respective obligations governing the transaction.  Philips delivered and installed the

MRI machine in NAZ's medical facility in Metairie, and in exchange for delivery and other obligations performed by Philips, NAZ began making its payments based on the financing arrangement it had with PMC.  NAZ then alleges that Philips' careless installation of the MRI equipment (among other failings) and the way its experts handled the consequences of that faulty installation, it has suffered very specific and wide ranging damages.  Suffice it to say, this is a simplistic summary of the plaintiff's very detailed factual allegations.

Philips challenges the sufficiency of these allegations, first taking issue with whether the complaint pleads facts sufficient to identify the parties to the alleged sale.  But simply consulting the face of the complaint -- as the Court must at the pleadings stage -- reveals the identities of the parties to the sale:  the complaint clearly alleges that NAZ, Inc. purchased from Philips the MRI equipment, and that the sale was financed through PMC.  Although the complaint specifies that Dr. Shamsnia negotiated the sale, it is alleged that he did so "on behalf of NAZ, Inc."

Philips concedes that the face of the complaint identifies these particular parties as the parties to the alleged sale (which should end the Court's inquiry at this stage), but Philips urges the Court to consider an extraneous exhibit it submits in support

of its "belief" that the true purchaser of the 3T MRI was, in fact, Advanced Neurodiagnostics Center, not NAZ, Inc.[4]   At this, the pleadings stage, the Court's task is not to resolve disputed fact issues by resort to matters outside the pleadings.   Rather, the Court's task is to view the _alleged_ facts in the light most favorable to the plaintiff to determine whether a claim upon which relief may be granted is plausibly stated.   Even if this "Quotation" was an exhibit ordinarily considered in assessing the sufficiency of pleadings, the Court finds that it is wholly inappropriate to consider it for the purpose advanced by the

---

[4] Submitting an exhibit that it says calls into question whether NAZ was the purchaser of the MRI equipment, Philips draws the Court's attention to a "Quotation" document that indicates:

Presented to:

ADVANCED NEURODIAGNOSTIC CENTER

 2905 Kingman St.

Metairie, LA 7006

MARTY SHAMSNIA

OWNER

...

The second page of this "Quotation" document describes as the product subject to the "lease" or "purchase order" the Ingenia 3.0T Omega product.   The purchase price is redacted, and there are other portions of the document that are scratched through, in addition to handwritten note at the end of the document indicating that the [redacted] purchase price is agreed upon subject to financing; the handwritten note also references "our previous agreement."

defendant.   Relative to the identity of the parties to the
transaction at issue, there is no credible dispute that the
plaintiff <u>alleges</u> that it, NAZ, Inc., purchased from Philips the
3T MRI, which was financed through PMC.  The Federal Rules require
no more.   If discovery exposes otherwise, Philips will enjoy
summary judgment efforts.[5]

Even if the complaint alleges facts sufficient to identify
the parties to the alleged sale, as the Court finds that it does,
Philips then advances three additional challenges to the
sufficiency of the plaintiff's allegations, arguing that: the
plaintiff fails to properly plead the parties' concurrence on "the
thing sold" (in that the plaintiff itself alleges that there was
no meeting of the minds on the terms and conditions of the sale);
the plaintiff fails to plead facts regarding the price of the thing
sold; and the plaintiff fails to plead facts sufficient to show a
concurrence on the consent of the parties element of a sale under

---

[5] Although this Quotation document is referenced in NAZ's
complaint, along with other quote documents and other terms and
conditions of sale, considering this exhibit to make a factual or
merits determination on the issue of whether NAZ was the true
purchaser of the MRI equipment is procedurally improper.  The only
issue for this Court to determine on a Rule 12(b)(6) motion is
whether the plaintiff's allegations plausibly state a claim for
relief.  And the Court does so by taking the allegations as true.
By attempting to call into question the truth of the plaintiff's
allegations, the defendant perverts the limited inquiry the Court
makes on a motion challenging the sufficiency of pleadings.

Louisiana law.  The plaintiff counters that it has alleged facts
sufficient to show or allow the inference that Philips sold NAZ
the MRI machine.  The plaintiff contends that it adequately alleges
that, while there was a meeting of the minds and consent on the
thing, price, and delivery, there was no meeting of the minds nor
consent regarding Philips' Standard Conditions of Sale, and there
was only partial delivery of the MRI package because the software
component was never delivered; the complaint alleges that after
much negotiation, the defendant delivered and installed complex
and expensive MRI equipment and that a financing arrangement was
made for doing so.  The plaintiff's allegations withstand the
defendant's three remaining challenges.

To be sure, a plaintiff alleging breach of contract arising
from a sale under Louisiana law must plead facts sufficient to
notify the defendant of the thing sold, that a price was paid for
the thing sold, and that the parties consented to the sale.  <u>See</u>
La. C.C. art. 2439.  The plaintiff pleads facts sufficient to
satisfy the federal pleading standard on these substantive state
law elements.  NAZ alleges that it purchased a 3T MRI complete
package (which at various places in the 22-page complaint is
alleged to include a variety of equipment, software, hardware,

installation, service, among other components)[6] from Philips for a price agreed to by the parties and financed by PMC,[7] and that both parties performed some or part of their obligations pursuant to their agreement; the facts alleged by NAZ, including that Philips delivered and installed and serviced an MRI machine it sold to NAZ, compels the Court to infer that the parties consented to the sale. That performance began while negotiations regarding the terms of the sale were ongoing, or that the some terms of the sale may not be finalized or contained in any one document, does not detract from the sufficiency of the factual allegations or reasonable inferences from those factual allegations that plausibly suggest that Philips sold its MRI equipment to NAZ. Finally, insofar as the defendant seeks a more definite statement from the plaintiff to "properly identify the parties to the alleged

---

[6] Philips takes issue with what it regards as "inconsistencies" and the plaintiff's failure to "clearly identify" what it means by "complete package." But the plaintiff alleges many facts in support of what was included in the sale and one may infer from these facts that the thing sold included not just the MRI machine and equipment needed to properly physically install it, but also hardware, software,, installation, and service.

[7] Like its other arguments, Philips' argument that the plaintiff failed to sufficiently plead a "sale" under Louisiana law because the plaintiff did not specify the exact price paid for the equipment and service elevates form over substance. Moreover, it appears that Philips itself redacted the purchase price listed on the two-page quote it asks this Court to consider; that same exhibit warns that the quote contains confidential information that may not be disclosed without Philips' consent.

contract of sale, the item(s) sold and the price paid for that item(s)" the defendant seeks to expand Rule 12(e) beyond its confined (if not obsolete) scope and appears to misunderstand the liberal pleading policy of Rule 8.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the defendant's motion is GRANTED in part (insofar as the plaintiff's jurisdictional allegations are defective as stated herein) and the motion is otherwise DENIED in part (insofar as the plaintiff's allegations concerning the sale of the MRI complete package satisfy Rule 8).  IT IS FURTHER ORDERED: that, within seven days, consistent with this Order and Reasons, pursuant to 28 U.S.C. § 1653, the plaintiff must file an amended complaint correcting its defective jurisdictional allegations.

New Orleans, Louisiana, July 26, 2017

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

24