UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


NAZ, LLC                                    CIVIL ACTION


v.                                          NO. 17-2882


PHILIPS HEALTHCARE, A DIVISION OF           SECTION "F"
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION


<u>ORDER AND REASONS</u>

Before the Court are two motions by the defendant: (1) Rule
12(c) motion to dismiss or, alternatively, Rule 56 motion for
summary judgment on plaintiffs' contract claim for property
damage; and (2) Rule 12(b)(6) motion to dismiss certain damages.
For the reasons that follow, the Rule 12(c) motion is DENIED; and
the Rule 12(b)(6) motion is GRANTED in part (insofar as it seeks
to dismiss punitive, exemplary, and non-pecuniary damages) and
DENIED in part (insofar as it seeks to dismiss claims for economic
loss damages).


**Background**

This litigation arises from a medical facility's purchase of
allegedly faulty MRI equipment, the manufacturer's allegedly
shoddy installation and service of the MRI equipment, as well as

its failure to provide the purchaser with the "complete package" including the hardware and software components that should have been delivered when the MRI equipment was installed.

This extensive factual summary is drawn from the allegations of the amended complaint. Philips Healthcare, a Division of Philips Electronics North America Corporation (Philips), designs, manufactures, tests, markets, sells, installs, and services medical and diagnostic equipment, including the Ingenia 3.0T Omega MRI.[1] Philips Medical Capital (PMC) is the financing arm of Philips, but Philips leads its customers to believe that Philips controls the financing terms of its equipment sales in order to coax sales.

NAZ, LLC owns a medical facility on Kingman Street in Metairie, Louisiana. Advanced Neurodiagnostic Center, Inc. Ad Neuro is the operational entity whose employees operate the diagnostic equipment and service and treat the patients who undergo diagnostic testing. The medical facility at 2909 Kingman Street was constructed to expand the existing medical center (2905 Kingman St.) with the addition of a state of the art neuroscience center

---

[1] MRI, or magnetic resonance imaging, is non-invasive imaging technology that, using a large magnet and radio waves, produces three-dimensional detailed anatomical images or organs and structures inside the body.

and ambulatory surgery center. Critical to this expansion, the neuroscience center was to house an Ingenia 3.0T Omega MRI. Dr. Morteza Shamsnia, as principal of NAZ and Ad Neuro, decided that a new, state of the art 3T MRI would provide better services to patients, would produce much higher quality MR images, would allow vast expansion of his research into subjects such as autism, dementia, Alzheimer's disease, concussions, post-traumatic stress disorder. Dr. Shamsnia decided the proper computer hardware and software equipment would expand the number and geographical reach of services, and thereby increase NAZ's and Ad Neuro's revenue and profits.

After research and discussions with various manufacturers, Dr. Shamsnia, on behalf of NAZ and Ad Neuro, decided to purchase the Philips Ingenia 3.0T Omega MRI neurological complete package. This complete package was crafted to serve NAZ's, Ad Neuro's, and Dr. Shamsnia's particular purposes for use of the machine. Philips marketed its product with promises and representations that the MRI package was the equipment needed to achieve the particular purposes sought by Dr. Shamsnia on behalf of NAZ and Ad Neuro.

Negotiations between Philips and Dr. Shamsnia continued in an attempt to reach an agreement on the sale terms and conditions and on the services, instructions, and recommendations by Philips.

While the negotiations continued, because of the delays, Philips, NAZ, and Ad Neuro agreed that Philips would deliver the Ingenia MRI package, and Dr. Shamsnia on behalf of NAZ and Ad Neuro agreed to follow Philips' experts' instructions and recommendations regarding installation and services.

On December 22, 2014, the Philips' team released the MRI package to NAZ and Ad Neuro and represented that it was safe for patient use. At that time, Philips began to request monthly payments on the MRI package. Dr. Shamsnia, on behalf of NAZ, began making payments to Philips' financing arm, PMC. NAZ and Ad Neuro hired a board certified MRI technician, who was sent to Philips' headquarters in Cleveland, Ohio to receive training on the 3T Philips MRI before January 5, 2015.

The MRI use on patients and volunteers began on January 5, 2015 and continued for only four days. When the technician returned on January 12, 2015, the technician noted improper signals during calibration as well as gaps and separation of the covers on the MRI unit. Immediately, she notified Philips engineers. That afternoon, a Philips engineer made a site visit and noticed these changes. When the engineer opened the bottom cover of the MRI unit, it revealed a significant, clear shift and sliding of the vibration pads from their originally installed location. The MRI

unit was inoperable and service was required to render it safe for operation.

Philips agreed to service the MRI unit, which was tendered to Philips' engineering team for modifications and repairs. On January 13, 2015, Philips' senior engineers arrived at the facility and discovered that the MRI had moved inches from where Philips' engineers had originally installed it. The engineers inquired about the possibility of an earthquake as the explanation for the movement. After inspecting the unit, the engineers evacuated the facility based on their concern that the unit might explode. They then "quenched" the MRI, a process involving de-energizing the MRI and discharging it of all of the helium gas in the MRI system; the helium was released through a vent pipe on the roof. The MRI was completely inoperable.

Two days later, one of NAZ's and Ad Neuro's employees discovered that water from the prior night's heavy rainfall had entered through the roof and flooded the floors, walls, and ceiling of the MRI room, as well as the floors of the surrounding rooms. It was later determined that the carelessly executed quenching process caused an opening in the roof through which the water entered the facility. NAZ and Ad Neuro paid $850,000 to repair the damage.

Even after months of communication, Philips' experts could not determine the cause of the MRI's malfunction. NAZ and Ad Neuro had to hire its own experts at its own expense. NAZ's and Ad Neuro's experts determined that the cause of the malfunction was the movement of the MRI in normal operation; the support system for the MRI equipment was inadequate, which caused the approximately 4,600 kilogram (10,000+ pound) magnet to move while the MRI was being used. When Philips was notified of this discovery, it admitted that the support system it had recommended and installed was neither suitable nor safe.

NAZ and Ad Neuro then spent more time and money to obtain additional equipment to repair the problem caused by Philips. The parties agreed that this remedial work was subject to the oversight, direction, control, and approval of Philips' engineers and done according to Philips' specifications and modifications. These included additional modifications to the door and the room in which the MRI was housed. Given the continuing inspections, troubleshooting, repairs, reinstallation, and testing, the MRI equipment was not re-activated until after April 2016.

Because the continuing repair, modification, reinstallation, and redelivery of the MRI equipment took so long, it was not until sometime after April 2016 that NAZ and Ad Neuro discovered that

the computer software and hardware package component that should have been installed with the MRI equipment had not been installed. Because the software and hardware component of the MRI package was central to NAZ's and Ad Neuro's agreement to purchase the MRI equipment from Philips at the particular price agreed upon, and because the computer component has not been delivered, NAZ and Ad Neuro claim that Philips has failed to deliver the MRI package it purchased. NAZ and Ad Neuro claim that Philips' failure to properly install and configure the MRI equipment and because of the structural alterations of the building caused by Philips' actions, an application to the appropriate governmental agency for approval of the ambulatory surgery center cannot be initiated by NAZ and Ad Neuro, which has resulted in loss of use and profits.

To operate the MRI equipment for clinical use, Philips required NAZ and Ad Neuro to complete advance training, which did not occur until after May 2016. Certification for clinical use of the MRI equipment by the American College of Radiology was not obtained until August 2016.

On April 4, 2017, NAZ, LLC sued Philips Healthcare, alleging gross fault (because, as a manufacturer of highly complex medical diagnostic equipment, Philips should be held to a heightened standard of care from which Philips grossly deviated) and several

breach of contract causes of action: breach of obligation to provide a complete system that would fit NAZ's particular purposes of which Philips was aware, in violation of Louisiana Civil Code article 2524; bad faith breach of contract in violation of Louisiana Civil Code article 1997; bad faith seller in redhibition, in violation of Louisiana Civil Code article 2520; failure to make timely delivery, in violation of Louisiana Civil Code article 2485; and breach of installation and service agreements. NAZ seeks to recover the following damages: purchase price and expenses occasioned by the sale; loss of business with respect to use of the MRI package; loss of business with respect to use of NAZ's surgery center; loss of profits with respect to use of the MRI package; loss of profits with respect to use of plaintiff's surgery center; loss of goodwill; costs and expenses incurred in relation to damages to the facility caused by the quenching of the MRI; loss of intellectual gratification and physical enjoyment of the MRI and ambulatory surgery center; inconvenience; financing costs and interest; costs incurred to mitigate damages and costs associated with repairs and testing of the MRI and MRI room; costs incurred to mitigate damages or costs associated with repairs to and testing of the MRI and MRI room; costs incurred to preserve the MRI and related equipment; depreciation; overhead costs and expenses; in the event of rescission, return of the purchase price

with interest from the time of the sale and all expenses incurred as a result of the sale; attorney's fees and litigation costs; and any and all penalties, punitive or exemplary damages, fines, fees, including treble damages afforded under Louisiana law.

On June 12, 2017, Philips moved for a more definitive statement regarding the LLC plaintiff's members' identity to determine subject matter jurisdiction. Philips also moved to dismiss any claims arising from an alleged contract of sale, and alternatively sought a more definite statement of those claims. On July 26, 2017, the Court granted the motion in part, ordering the plaintiff to amend the complaint to identify the citizenship of the plaintiff's members; the Court denied the motion in part insofar as Philips sought to dismiss breach of contract claims and sought a more definitive statement. On November 2, 2017, the plaintiff filed an amended complaint to add Ad Neuro as plaintiff and to clarify Ad Neuro's relationship to NAZ. The defendant now moves to dismiss plaintiffs' $850,000 claim for property damage arising from the allegedly botched MRI repair and moves to dismiss plaintiffs' claims for punitive, exemplary, non-pecuniary, and duplicitous economic loss damages.

I.

*A.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is viewed with disfavor. See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th

Cir. 2012)(en banc)).   But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true.   Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (citations and footnote omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. at 678 (internal quotations omitted)(citing Twombly,

550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

*B.*

Federal Rule of Civil Procedure 12(c) permits any party to move for a judgment on the pleadings, provided the motion is made early enough to avoid delaying trial. A court may grant a Rule 12(c) motion only if the pleadings evince no disputes of genuine material fact and questions of law alone remain. Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002) (citations omitted). Courts should thus adhere to the same standard in reviewing a 12(c) motion as they do in

reviewing motions to dismiss under Rule 12(b)(6), accepting all well-pleaded facts as true and drawing all factual inferences in favor of the non-movant. See id. at 313 n.8; Alexander v. City of Round Rock, 854 F.3d 298, 303 (5th Cir. 2017) (citing Thompson, 764 F.3d at 502; Stokes v. Gann, 498 F.3d 483, 484 (5th Cir. 2007)); Doe v. Myspace, Inc., 528 F.3d 413, 418 (5th Cir. 2008); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2004).

> The determining issue is not whether the plaintiff will ultimately prevail on the merits, but whether he is entitled to offer evidence to support his claim. Therefore, this court will not dismiss a plaintiff's claim, "unless the plaintiff will not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in his complaint."

Priester v. Lowndes Cty., 354 F.3d 414, 418-19 (5th Cir. 2004) (citing and quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)).

Just like when it reviews a motion to dismiss under Rule 12(b)(6), when reviewing a Rule 12(c) motion, a district court must consider the pleadings, any documents the pleadings incorporate by reference, and matters of which the court may take judicial notice. Funk, 631 F.3d at 783.

*C.*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); see also Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted) ("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of a claim. See

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must adduce competent evidence, including but not limited to sworn affidavits and depositions, to buttress his claims.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  However, affidavits or pleadings which contradict earlier deposition testimony cannot create a genuine issue of material fact sufficient to preclude an entry of summary judgment.  See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 137 n. 23 (5th Cir. 1992).

In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  Scott v. Harris, 550 U.S. 372, 378 (2007) (citations omitted).  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

*A.*

First, Philips seeks to dismiss the plaintiffs' property damage claim arising from the allegedly botched repair, or, alternatively, summary relief, on the ground that the plaintiffs' claim has prescribed. Because the allegedly defective MRI caused the water damage to the plaintiffs' building, the defendant argues, the Louisiana Products Liability Act (LPLA) precludes any other theory of liability that would extend the one-year delictual prescriptive period. Therefore, the claim prescribed on January 18, 2016, one year since January 15, 2015, the date plaintiffs allege to have discovered the water damage. In support of its motion for summary judgment, the defendants submit an email from Dr. Shamsnia to Philips dated December 4, 2015, in which he states the quenching caused the MRI unit to move and allowed rain to enter the building. At the latest, the defendants contend that the plaintiffs' claim prescribed on December 4, 2016, well before suit was filed on April 4, 2017.

The plaintiffs counter that the property damage was caused by Philips's engineers' conduct—not the MRI machine itself—and that the engineers' actions breached installation and service agreements with Philips. Accordingly, the plaintiffs submit that

this property damage claim is properly characterized as a breach of contract, beyond the scope of the LPLA, and subject to a 10-year prescriptive period, which renders the action timely. The plaintiffs also contend that summary judgment is premature because, while the parties acknowledge a contractual relationship, the parties dispute what obligations comprised it. The Court finds that the plaintiffs have plausibly stated a breach of contract claim that is not facially prescribed. The defendant's request for summary judgment is premature, considering only one email has been filed into the record to facilitate resolution of the prescription issue on the merits.

*B.*

When subject matter jurisdiction is based on diversity, federal courts apply the substantive law of the forum state. <u>Boyett v. Redland Ins. Co.</u>, 741 F.3d 604, 607 (5th Cir. 2014). Here, Louisiana's prescriptive periods govern. <u>See</u> <u>id.</u> For delictual actions, the prescriptive period is one year from the day injury or damage is sustained. La. C.C. art. 3492. However, the "prescriptive period does not begin to run until the plaintiff has actual or constructive knowledge of the tortious act, the damage, and the causal relationship between the tortious act and the damage." <u>Aucoin v. Amneal Pharm., LLC.</u>, No. 11-1275, 2012 WL

2990697, at *4 (E.D. La. July 20, 2012) (quoting Knaps v. B & B Chem. Co., 828 F.2d 1138, 1139 (5th Cir. 1987)). For contract actions, the prescriptive period is 10 years, running from the day an obligor breaches his obligation. McClellan v. Premier Nissan, L.L.C., 14-726, p. 4 (La. App. 5 Cir. 2/11/15); 167 So. 3d 934, 936; Gen. Accident Ins. Co. of Am. v. Aggreko, LLC., No. 11-1682, 2012 WL 6569332, at *5 (W.D. La. Dec. 17, 2012) (citing La. C.C. art. 3499); see also Stalter v. Arthur J. Gallagher Risk Mgmt. Servs., Inc., No. 16-12786, 2017 WL 2189816, at *2 (E.D. La. May 18, 2017). Where a defendant's actions support a claim in both tort and contract, a plaintiff is free to pursue either theory of recovery. See Ill. Cent. R. Co. v. New Orleans Terminal Co., 143 La. 467, 473 (1918). "The applicable prescriptive period is determined by the character of the action as it is stated in the complaint." Stalter, 2017 WL 2189816, at *2 (citing Fishbein v. State ex rel. La. State Univ. Health Scis. Ctr., 2004-2482, pp. 6-7 (La. 4/12/05); 898 So. 2d 1260, 1265).

Generally, the party asserting that a claim has prescribed bears the burden of proof. Peterson v. C. R. Bard, Inc., 654 F. App'x 667, 670 n. 2 (5th Cir. 2016) (quoting In re Brewer, 2005-0666, p. 4 (La. App. 1 Cir. 5/5/06); 934 So. 2d 823, 826)). However, when a complaint reveals on its face that the prescriptive period has lapsed, the burden shifts to the plaintiff. Id.

*C.*

The LPLA provides "the exclusive theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. § 9:2800.52. "Damage" is defined as "all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1, and 2315.2 allow recovery,"[2] including "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,' does not allow recovery for such damage or economic loss,"[3] and excluding attorneys' fees. La. Rev. Stat. § 9:2800.53 (5). In other words, a plaintiff must bring an action under the LPLA to recover all damages caused by a product, except for damage to the product itself and economic loss sought under the Chapter 9 Redhibition articles. See generally John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565

---

[2] La. C.C. art. 2315 provides for "Liability for acts causing damages;" art. 2315.1 provides the "Survival action;" and art. 2315.2 provides the "Wrongful death action." These articles establish the foundation for Louisiana tort liability. 12 WILLIAM E. CRAWFORD, LA. CIVIL LAW TREATISE § 1:10 (2d ed. 2017).

[3] Chapter 9 of Title VII of Book III of the Civil Code, entitled "Redhibition," provides a buyer several causes of action against the seller when the seller breaches the warranty against redhibitory defects (art. 2520), the warranty of fitness for use (art. 2542), and the obligation to deliver conforming things (art. 2529). C-Innovation, LLC v. Norddeutsche Seekabelewerke GMBH, No. 10-4441, 2013 WL 990026, at *4 (E.D. La. Mar. 13, 2013).

(1989). Grappling with the plain language of the statute and comments to the Civil Code, courts have struggled to define the scope of this carve-out. See, e.g., C-Innovation, LLC v. Norddeutsche Seekabelewerke GMBH, No. 10-4441, 2013 WL 990026, at *4-5 (E.D. La. Mar. 13, 2013); Hollybrook Cottonseed Processing, LLC v. Carver, Inc. (Hollybrook I), No. 09-0750, 2010 WL 892869, at *6-8 (W.D. La. Mar. 11, 2010). Nevertheless, there is a consensus that the LPLA does not preclude a redhibitory action against the manufacturer seeking economic loss damages. See, e.g., Am. Home Assurance Co. v. Oceaneering Int'l, Inc., 609 F. App'x 171, 176-78 (5th Cir. 2015); Chevron USA, Inc. v. Aker Maritime, Inc., 604 F.3d 888, 900 (5th Cir. 2010); Hollybrook Cottonseed Processing, LLC v. Carver, Inc. (Hollybrook II), No. 09-0750, 2010 WL 2195685, at *4-5 (W.D. La. May 28, 2010); Hollybrook I, 2010 WL 892869, at *6-7; Aucoin v. S. Quality Homes, LLC, 2007-1014, p. 7 n.8 (La. 2/26/08); 984 So. 2d 685, 691 n.8.

Where a plaintiff seeks to recover against the manufacturer for damages other than economic loss in redhibition, the cause of the damage determines the LPLA's preclusive effect. Hollybrook II, 2010 WL 2195685, at *4; see also Hollybrook I, 2010 WL 892869, at *7. Where a plaintiff does not seek damages caused by the product itself, but, rather, seeks damages based on contractual obligations beyond the scope of the express or implied warranty

20

for redhibition, courts have found that the LPLA does not preclude such an action. See, e.g., C-Innovation LLC, 2013 WL 990026, at *6-7 (denying a motion to dismiss a fraud-based contractual claim against the manufacturer, reasoning that "[t]he economic damages C-Innovation is seeking are not by virtue of an action in redhibition and are not caused by the product itself"); Jack B. Harper Contractor, Inc. v. United Fiberglass of Am., Inc. (Harper II), No. 11-20, 2013 WL 12238500, at *2, *7 (E.D. La. Jan. 30, 2013) (noting that the jury found the manufacturer liable for breach of a contractual obligation to provide installation instructions in addition to liability under two prongs of the LPLA); Jack B. Harper Contractor, Inc. v. United Fiberglass of Am., Inc. (Harper I), No. 11-20, 2012 WL 2087394, at *2 (E.D. La. June 8, 2012) (denying summary judgment due to "an issue of fact as to whether Harper's claims fall solely within the LPLA"); Hollybrook I, 2010 WL 892869, at *7 (granting summary judgment in the defendant's favor on breach of contract claims arising from allegedly defective equipment, but denying defendant's request for summary judgment as to plaintiff's claims sounding in contract, where the contract called for providing equipment to process a certain daily capacity of cottonseed, as well as "certain engineering, repair, and training services"), accord Hollybrook II, 2010 WL 2195685, at *3 (clarifying that the court in Hollybrook

*I* found "that the LPLA precludes Hollybrook's general breach of contract claims *to the extent they seek damages caused by Carver's products*") (emphasis added).

To determine whether the LPLA bars a particular breach of contract cause of action, the focus is on whether the plaintiff alleges that the damage was caused by the manufacturer's product:

> While the exclusivity provision of the LPLA leaves no doubt breach of contract claims against manufacturers for damages caused by their products are subsumed by the LPLA, in cases where a specific part of the injury is caused *only* by the breach of contract, and not by the product itself, a buyer might be able to bring both types of claims against a manufacturer. . . . [I]n the limited circumstances where a buyer sues a manufacturer for economic damages not covered in redhibition and not caused by the product itself, it may bring a breach of contract claim for those damages, on its own or in addition to a claim for other damages under the LPLA or redhibition.

Hollybrook I, 2010 WL 892869, at *7. Thus, when the source of damage is not the product itself but, for instance, a fraudulent misrepresentation made by the manufacturer, or a failure to provide services in breach of a contract separate and apart from the contract of sale, a plaintiff may bring this distinct claim alongside or independently from an LPLA claim. See C-Innovation, LLC, 2013 WL 990026, at *6-7; Hollybrook I, 2010 WL 892869, at *7. In this context, the LPLA has not precluded a breach of a contract to provide repairs, nor a claim for negligent repair against a

22

manufacturer that would be vicariously liable for its employees' negligent repair. <u>Hollybrook I</u>, 2010 WL 892869, at *7; <u>see</u> <u>Debose v. Sam's East, Inc.</u>, No. 09-05, 2010 WL 11468975, at *1-2, *4 n.1 (M.D. La. Sept. 3, 2010).

On the other hand, when damage is caused by the product, the LPLA applies to preclude all actions (besides the Chapter 9 carve-out), regardless of the theory of liability. <u>Hollybrook II</u>, 2010 WL 2195685, at *4-5; <u>see</u> <u>also</u> <u>Am. Zurich Ins. Co. v. Caterpillar, Inc.</u>, 2012-270, pp. 6-7 (La. App. 3 Cir. 10/3/12); 99 So. 3d 739, 743-44 (holding that the LPLA precluded a breach of contract claim where "no claim relative to the service contract . . . would withstand distinction from a straight-forward defective product claim"). In this context, the LPLA has precluded claims for breach of contract and negligent repair. <u>Stroderd v. Yamaha Motor Corp., U.S.A.</u>, No. 04-3040, 2005 WL 2037419, at *2 (E.D. La. Aug. 4, 2005). Moreover, the buyer may not recover damage to other property besides the product itself that was caused by the defective product. <u>Chevron USA, Inc.</u>, 604 F.3d at 900-01.

*D.*

In the amended complaint, the plaintiffs allege that "the actions of the Philips' engineers caused an opening in the roof through which the water came into the facility." Specifically, the

plaintiffs allege that Philips' engineers' actions support a cause

of action for "Breach of Installation and Service Agreements":

> 71. Defendant represented to Plaintiffs that it had the special, superior, and/or professional skill to properly direct and instruct the Plaintiffs as to the location where the MRI should be placed, the configuration of that room, and the equipment and components that would result in the safe and proper operation of the MRI for the purposes for which the Plaintiffs intended.

> i. Plaintiffs and Defendant agreed that Defendant would uphold the obligation to properly install and service the MRI package safely and with necessary skill and expertise required to perform those obligations. Defendant grossly failed to perform those obligations with the necessary skill and expertise required to do so.

> ii. Defendant's failure to perform these obligations to the standards it was required to uphold was a breach of these agreements, which breach resulted in damages and lost profits to Plaintiffs.

> iii. In January 2015, the parties entered into an additional agreement whereby Defendant would investigate, determine, correct and reinstall the MRI package to repair the defect, including to prevent movement of the MRI magnet. Plaintiffs relied on Defendant's skill and expertise to perform these obligations.

> iv. In performing these obligations, Defendant's fault and/or gross fault caused water to seep into the building and caused damages and further delay in preparing the MRI for operation in accordance with its intended purposes, resulting in further damages and lost profits to Plaintiffs.

> v. Defendant further failed to fulfill its obligations as a skilled expert to determine the source of the defect and problems, and complete the necessary reinstallation to allow Plaintiffs to operate the MRI for its intended purposes. Defendant breached its obligation to provide personnel capable of installing the MRI equipment and capable of diagnosing and correcting the defects and

> problems associated with the MRI equipment. Defendant's
> failure to fulfill these obligations resulted in
> Plaintiffs' inability to reactivate the MRI until April
> 2016; and, but for Plaintiffs being forced to hire their
> own experts at their own expense, the MRI package would
> have been inoperable for a much longer period of time.

The defendant characterizes the plaintiffs' claim for water damage to their facility as damage to "other property" as defined in Chevron USA v. Aker Maritime, Inc., 604 F.3d 888, 900-01 (5th Cir. 2010), which can only be recovered in tort under the LPLA. Because the one-year prescriptive period for the tort claim has run, the defendant argues, the plaintiffs' claim for this property damage has facially prescribed. The Court disagrees.

Chevron is distinguishable. There, the manufacturer of defective bolts did not perform the repairs nor have a separate contract with the buyer. Chevron, 604 F.3d at 890-91. But see id. at 902 (reversing the dismissal of Chevron's breach of contract claims against the manufacturer and remanding for further explanation). Chevron sought to recover damages from the manufacturer under the implied contract theory of redhibition. Id. at 899. Here, the Court must take as true the plaintiffs' allegations, and the plaintiffs allege that the parties entered into both installation and service agreements, that Philips' engineers negligently left a hole in the roof while performing

obligations to install and service the MRI, and that Philips thereby breached the parties' agreement, causing property damage.

Viewing the well pleaded facts as true and in the light most favorable to the plaintiffs, Philips breached installation and service agreements separate and apart from the contract of sale and redhibitory warranty. That is, the plaintiffs allege that Philips' engineers breached their obligation to repair the MRI and that the engineers' actions caused property damage. The plaintiffs' claims are more like those in Hollybrook I, where a separate contract for services constituted an additional claim to any LPLA claim. Hollybrook I, 2010 WL 892869, at *7; see also Hollybrook II, 2010 WL 2195685, at *3. Although the defendant suggests Hollybrook II holds that the LPLA subsumes all claims against the manufacturer based on contractual theories of liability, the defendant fails to recognize that such reasoning only applies to damages caused by the product. Hollybrook II did not disturb Hollybrook I's finding that a plaintiff may bring a breach of contract claim against the manufacturer where "a buyer sues a manufacturer for economic damages not covered in redhibition and not caused by the product itself." Hollybrook I, 2010 WL 892869, at *7; see Hollybrook II, 2010 WL 2195685, at *3 (limiting discussion of the LPLA's exclusion of the plaintiff's "general breach of contract claims *to the extent they seek damages caused*

*by Carver's products*") (emphasis added). Furthermore, the district court in C-Innovation, LLC cited Hollybrook I to support its finding that the LPLA did not subsume a buyer's fraud-based contract claim against a manufacturer, which compels the conclusion that the LPLA does not prevent a buyer from bringing contract claims against a manufacturer where contractual damages are distinct from damage caused by a product. 2013 WL 990026, at *6 (quoting and citing Hollybrook I, 2010 WL 892869, at *6-8); see also Harper II, 2013 WL 12238500, at *2, *7 (noting that the jury found the manufacturer liable for breach of a contractual obligation to provide installation instructions in addition to liability under two prongs of the LPLA).

Chevron is distinguishable for another reason. The buyer's sole argument in Chevron centered on the narrow issue of whether damages to the spar, Chevron's "other property," could be characterized as economic loss recoverable against the manufacturer of defective bolts under a theory of redhibition. See id. at 899-901. Notably, neither party argued whether the damage to the spar was "damage" as defined by the LPLA; rather, Chevron narrowly decided that the cost to repair the spar could not be characterized as economic loss damages. See Am. Home Assur. Co., 609 F. App'x at 178 (citing Chevron, 604 F.3d 888). Here, the plaintiffs allege that their property was damaged, not by a

redhibitory defect, but by Philips' breach of the parties' service contract. The plaintiffs allege that the manufacturer's engineers negligently created a hole in the roof in order to make repairs to the defective MRI—specifically, to allow for a "quenching" process to release dangerous levels of radioactive chemicals. And, they allege, Philips' engineers left that hole open overnight, which allowed rain to enter and damage their property. While the defendant contends that the "quenching" process itself, without reference to its technicians' actions, caused the property damage, this Court must view the allegations in the light most favorable to the plaintiffs. Accordingly, at this stage, the Court must consider the plaintiffs' allegations that it was not the MRI alone that caused the plaintiffs to sustain water damage. Philips has failed to persuade the Court that the LPLA precludes the plaintiffs' breach of contract claim where, as here, the plaintiffs allege that Philips' engineers caused the damage, not the product. Of course, the Court does not rule on the merits of the plaintiffs' breach of contract claim. It is patently premature to consider summary judgment where the parties dispute the existence of a contract, and the defendant merely points to a stray email in which Dr. Shamsnia appears to assert a legal conclusion yet to be proven. See Harper I, 2012 WL 2087394, at *2.

Philips fails to persuade the Court that the plaintiffs' breach of contract claim relative to the property damage is barred by the LPLA as a matter of law. Accordingly, Philips' argument that this claim is delictual in nature and prescribed must be rejected at this stage. The plaintiffs characterize the property damage claim as a breach of contract, which calls for a prescriptive period of 10 years running from the alleged breach in January, 2015, and, thus, the claim has not facially prescribed.

Louisiana case literature distinguishing sales contracts from other kinds of contracts reinforces this result at this stage of the litigation. Louisiana courts have long looked to the fundamental obligation of a contract to determine what body of law governs it. See Austin's of Monroe, Inc. v. Brown, 474 So. 2d 1383, 1387-88 (La. App. 2 Cir. 1985); Hunt v. Suares, 9 La. 434, 435-46 (1836); see, e.g., Mouton v. Generac Power Sys., 14-350, pp. 12-13 (La. App. 3 Cir. 11/5/14); 152 So. 3d 985, 994. If the fundamental obligation of a contract is a sale (where the parties consent to transfer ownership of a thing for a price in money), the contract is governed by the law of sale, and therefore, redhibition. See Mouton, 14-350 at pp. 12-13; 152 So. 3d at 994; La. C.C. arts. 2439, 2520, et seq. Any incidental obligations *to do* (e.g., to service and install the thing) do not extricate the contract from Louisiana sales law. See Mouton, 14-350 at pp. 12-

13; 152 So. 3d at 994; La. C.C. art. 1756; 24 Dɪᴀɴ Tᴏᴏʟᴇʏ-Kɴᴏʙʟᴇᴛᴛ & Dᴀᴠɪᴅ Gʀᴜɴɪɴɢ, Lᴀ. Cɪᴠɪʟ Lᴀᴡ Tʀᴇᴀᴛɪsᴇ, Sᴀʟᴇs § 1:10 (Supp. 2017). As a result, the prescriptive periods and warranties of sale, such as the warranty against redhibitory defects, apply to breaches of sales contracts, even when the sale also provides for ancillary services. See Mouton, 2014-350 at pp. 12-13; 152 So. 3d at 994.

Here, the Court is unable to classify the disputed contract(s) because neither party submits evidence—or one contract—that would allow the Court to consider whether the sale of the MRI package contained merely ancillary obligations to perform installation and maintenance services, or whether, as plaintiffs allege, separate service agreements formed additional obligations. It is also unknown what the warranty, as the defendant alleges is incorporated into the Standard Terms and Conditions in the contract of sale, stipulates, and whether it was effectively waived. See La. C.C. art. 2548. The Court must view the allegations in the light most favorable to plaintiffs, and they allege that a separate contract exists to support a breach of contract claim, which has a 10-year prescriptive period. Thus, their property damage claim has not facially prescribed. And, summary judgment is not warranted.

In their amended complaint, the plaintiffs allege causes of action for "gross fault" and breaches of contract. They list 18 categories of damages that they seek to recover. In its second motion to dismiss, Philips challenges the plaintiffs' attempt to recover 10 out of the 18 categories of damages.

*A.*

Philips contends that, as a matter of law, the plaintiffs may not recover punitive or exemplary damages or non-pecuniary damages. The plaintiffs concede that they are not entitled to recover such damages. Given that Louisiana law precludes the plaintiffs' recovery of punitive or exemplary damages as well as non-pecuniary damages,[4] the plaintiffs' claims for the following categories of damages must be dismissed: Loss of intellectual gratification and/or physical enjoyment of the MRI and ambulatory

---

[4] La. C.C. art. 3546 permits punitive or exemplary damages only when authorized by statute, and La. C.C. art. 1998 permits non-pecuniary damages when the contract, by its nature or by the intent of the parties, gratifies a non-pecuniary interest. No statute authorizes punitive or exemplary damages here, and the sale, service and installation of the MRI package does not gratify a non-pecuniary interest of the plaintiffs as juridical entities. See Walle Corp. v. Rockwell Graphics Sys., Inc., No. 90-2163, 1992 WL 245963, at *5 (E.D. La. Sept. 21, 1992).

surgery center; inconvenience; and any and all penalties, punitive or exemplary damages, fines, fees, afforded under Louisiana law.

*B.*

While Philips acknowledges that plaintiffs may bring a claim for economic loss, Philips contends that the following damages are impermissibly duplicative of economic loss:

> ii. Loss of business with respect to use of the MRI package;
>
> iii. Loss of business with respect to use of Plaintiffs' ambulatory surgery center;
>
> iv. Loss of profits with respect to use of the MRI package;
>
> v. Loss of profits with respect to use of Plaintiffs' ambulatory surgery center;
>
> vi. Loss of goodwill;
>
> . . . .
>
> xiii. Depreciation;
>
> xiv. Overhead costs and expenses.

The Court disagrees. Philips cites no persuasive or binding law to suggest that plaintiffs cannot plead specific categories of economic loss, nor does Philips challenge plaintiffs' ability to recover economic loss generally. Philips' attempt to convince the Court to dismiss certain specific alleged damages components as duplicative, where the Court will not permit duplicative recovery, elevates form over substance.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the Rule 12(c) motion is DENIED; and the Rule 12(b)(6) motion is GRANTED in part (insofar as it seeks to dismiss punitive, exemplary and non-pecuniary damages) and DENIED in part (insofar as it seeks to dismiss claims for economic loss damages).

New Orleans, Louisiana, March 8, 2018

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE