UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


NAZ, LLC                                          CIVIL ACTION

VERSUS                                            NO. 17-2882

PHILIPS HEALTHCARE, A DIVISION                    SECTION: M (4)
OF PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION


## ORDER & REASONS

Before the Court is defendant Philips Healthcare ("Philips"), a Division of Philips

Electronics North America Corporation's motion for partial summary judgment regarding

prescription of plaintiffs' Louisiana Products Liability Act ("LPLA") claim, R. Doc. 139, to

which plaintiffs NAZ, LLC ("NAZ") and Advanced Neurodiagnostic Center, Inc. ("Ad Neuro")

(collectively "Plaintiffs") respond in opposition, R. Doc. 193, and in support of which Philips

replies, R. Doc. 210; Philips' motion for partial summary judgment regarding prescription of

Plaintiffs' redhibition claims, R. Doc. 160, to which Plaintiffs respond in opposition, R. Doc.

196, and in support of which Philips replies, R. Doc. 206; Philips' motion for partial summary

judgment regarding the preclusive effects of the application of the LPLA and Louisiana

redhibition law, R. Doc. 163, to which Plaintiffs respond in opposition, R. Doc. 195, and in

support of which Philips replies, R. Doc. 208; Philips' motion to strike Plaintiffs' jury demand,

R. Doc. 141, to which Plaintiffs respond in opposition, R. Doc. 187, and in support of which

Philips replies, R. Doc. 191; and Plaintiffs' appeal of the Magistrate Judge's decision denying

their motion for leave to file a second amended complaint, R. Doc. 180, to which Philips

responds in opposition, R. Doc. 199, and in support of which Plaintiffs reply, R. Doc. 213.

Having considered the parties' memoranda and the applicable law, the Court issues this Order &

Reasons.

## I.    BACKGROUND

This litigation arises from a medical facility's purchase of allegedly faulty MRI equipment,[1] the manufacturer's allegedly faulty installation and service of the MRI equipment, as well as its failure to provide the purchaser with the "complete package," including the hardware and software components that should have been delivered when the MRI equipment was installed.

NAZ owns a medical facility at 2909 Kingman Street in Metairie, Louisiana ("medical facility").[2] Ad Neuro is the operational entity whose employees operate the diagnostic equipment and service and treat the patients who undergo diagnostic testing.[3] The medical facility was renovated to expand the existing medical center with the addition of a state-of-the-art neuroscience center and ambulatory surgery center.[4] Dr. Morteza Shamsnia, as principal of NAZ and Ad Neuro, researched MRI equipment for the neuroscience center and eventually chose the Ingenia 3.0T Omega MRI neurological complete package manufactured and sold by Philips, which designs, manufactures, tests, markets, sells, installs, and services medical and diagnostic equipment.[5]

In December 2011, Dr. Shamsnia, on behalf of NAZ and Ad Neuro, signed a quote document which set forth the price and components, packages and services Philips promised to deliver ("Revision 10").[6] Plaintiffs allege that Dr. Shamsnia made a counteroffer to Philips' quote by adding that the purchase and acceptance of the terms and conditions were contingent upon Philips' providing financing for the purchase of the MRI equipment with a 3.9% interest

---

[1] MRI, or magnetic resonance imaging, is non-invasive imaging technology that, using a large magnet and radio waves, produces three-dimensional detailed anatomical images or organs and structures inside the body.
[2] R. Doc. 47 at 1.
[3] *Id.* at 1-2.
[4] *Id.* at 2.
[5] *Id.* at 2 & 11.
[6] *Id.* at 3.

rate.[7]   Philips never signed Revision 10, and Plaintiffs allege that negotiations were ongoing regarding the terms and conditions of the sale.[8]

Moreover, Plaintiffs allege that Phillips misrepresented that it had the authority to offer the financing terms required by Dr. Shamsnia.[9]   In particular, Plaintiffs allege they learned that Philips and its alleged financing entity, Philips Medical Capital ("PMC"), were wholly separate entities, and that PMC had sole control of any financing agreement related to the sale of the MRI equipment, in August 2016 when PMC placed them in default of their loan.[10]

In May 2012, Philips sent another quote to Dr. Shamsnia, with effective dates of May 4 to June 28, 2012 ("Revision 12").[11]   According to Plaintiffs, Dr. Shamsnia signed the second page of Revision 12 on May 18, 2012, as instructed by Philips, to reiterate his acceptance of certain price and financing terms.[12]   Dr. Shamsnia wrote on page 2 of Revision 12: "Approve the purchase price of $1,679,661.37 per our previous agreement with one year service contract included.   The purchase financed by Philips financial per previous agreement."[13]   Plaintiffs contend that this note constituted a counteroffer to Revision 12.[14]   Plaintiffs allege that Philips never discussed its standard "Terms and Conditions of Sale" with Dr. Shamsnia, and he never agreed to bind Plaintiffs thereto.[15]   Dr. Shamsnia later confirmed to Philips that he wanted to purchase a service contract as a part of the sale of the MRI equipment.[16]

Plaintiffs allege that, notwithstanding the ongoing communications and negotiations surrounding the terms and conditions of the sale, Plaintiffs and Philips agreed that Philips would

---

[7] *Id.*
[8] *Id.*
[9] *Id.* at 3-4.
[10] *Id.* at 4.
[11] *Id*.
[12] *Id.* at 4.
[13] R. Doc. 139-9 at 2.
[14] R. Doc. 193 at 5.
[15] R. Doc. 47 at 4.
[16] R. Doc. 193 at 6-7.

deliver the MRI equipment to Plaintiffs.[17] Dr. Shamsnia, on Plaintiffs' behalf, agreed to follow the Philips experts' instructions and recommendations regarding installation and services.[18] Prior to installation of the MRI equipment, the medical facility and the room that were to house the MRI equipment had to be modeled and constructed according to the Philips experts' plans and specifications.[19] Plaintiffs began to prepare the second floor of the medical facility to house the MRI equipment.[20] However, Philips informed Dr. Shamsnia that, due to vehicular movement in the medical facility's parking lot below, the MRI equipment would have to be located on the third floor.[21] Plaintiffs allege that additional costs were incurred to prepare the third floor of the medical facility for the MRI equipment, and that Philips asserted that redesigned, special pads were sufficient to eliminate Plaintiffs' concerns regarding vibration.[22]

On December 22, 2014, Philips' team released the MRI equipment to NAZ and Ad Neuro, representing that it was safe for patient use.[23] At that time, Philips began to request monthly payments on the MRI package.[24] Dr. Shamsnia, on behalf of NAZ, began making payments to PMC.[25] Plaintiffs hired a board-certified MRI technician, who was sent to Philips' headquarters in Cleveland, Ohio, to receive training on the Ingenia 3.0T Omega MRI before commencing use of the MRI equipment.[26]

On January 5, 2015, Plaintiffs began using the MRI equipment on patients and volunteers.[27] On January 12, 2015, the MRI technician noted improper signals during calibration of the machine as well as gaps and separation of the covers on the MRI equipment.[28]

---

[17] R. Doc. 47 at 5.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at 5-6.
[23] *Id.* at 6.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 7.
[27] *Id.*
[28] *Id.*

Immediately, she notified Philips' engineers.[29]   That afternoon, a Philips engineer made a site visit and noticed these changes.[30]   When the engineer opened the bottom cover of the MRI equipment, he found a significant and clear shift and sliding of the vibration pads from their originally-installed location.[31]   The MRI equipment was inoperable and service was required to render it safe for operation.[32]

Plaintiffs then tendered the MRI equipment back to Philips for modifications and repairs.[33]   On January 13, 2015, Philips' senior engineers arrived at the medical facility and discovered that the MRI equipment had moved inches from where Philips' engineers had originally installed it.[34]   The engineers inquired about the possibility of an earthquake as the explanation for the movement.[35]   After inspecting the MRI equipment, the engineers evacuated the facility based on their concern that the MRI equipment might explode.[36]   They then "quenched" the MRI equipment, a process involving de-energizing the MRI equipment and discharging it of all helium gas; the helium was released through a vent pipe on the roof.[37]   The MRI equipment was completely inoperable.[38]

Two days later, one of Plaintiffs' employees discovered that water from the prior night's heavy rainfall had entered through the roof and flooded the floors, walls, and ceiling of the MRI room, as well as the floors of the surrounding rooms.[39]   Plaintiffs allege that, during the quenching process, Philips' engineers caused an opening in the roof through which the water

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.* at 7-8.
[37] *Id.* at 8.
[38] *Id.*
[39] *Id.*

entered the medical facility.[40]  Plaintiffs allege that they paid $850,000 to repair the property damage.[41]

Plaintiffs allege that they had to hire their own experts at their own expense to determine the cause of the MRI equipment's malfunction because Philips' experts could not do so.[42] Plaintiffs' experts allegedly determined that the cause of the malfunction was the movement of the MRI equipment in normal operation because the support system for the MRI equipment was supposedly inadequate, which caused the approximately 4,600 kilogram (10,000-plus pound) magnet to move while the MRI equipment was being used.[43]  After being notified of the Plaintiffs experts' analysis, Philips allegedly admitted that the support system was inadequate.[44]

Plaintiffs claim that Philips agreed to uninstall and reinstall the MRI equipment.[45] Plaintiffs allege that the parties agreed that this remedial work was subject to the oversight, direction, control, and approval of Philips' engineers and done according to Philips' specifications and modifications.[46]  The work included additional modifications to the door and the room in which the MRI equipment was housed.[47]  Plaintiffs allege that, given the continuing inspections, troubleshooting, repairs, reinstallation, and testing, the MRI equipment was not re-activated until after April 2016, and at that time Plaintiffs discovered that the computer software and hardware package – components of the "complete package" – that should have been installed with the MRI equipment had not been installed.[48]  Because the computer package was allegedly central to Plaintiffs' agreement to purchase the MRI equipment from Philips at the particular

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.* at 8-9 & 13.
[44] *Id.* at 9.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* at 9-10.

price agreed upon, and because the computer package still has not been delivered, Plaintiffs claim that Philips has failed to deliver the complete MRI package they purchased.[49]

To operate the MRI equipment for clinical use, Philips required NAZ and Ad Neuro to complete advanced training, which did not occur until after May 2016.[50] Certification for clinical use of the MRI equipment by the American College of Radiology was not obtained until August 2016.[51] Plaintiffs further allege that, due to the continuous repair, modification, reinstallation and redelivery of the MRI equipment, along with the structural alterations to the building caused by Philips' actions, they have been unable to compete construction, installation, and the process of obtaining permits and governmental agency approvals for the operation of the ambulatory surgery centers in the facility, which has resulted in loss of use and profits.[52]

On April 4, 2017, NAZ filed this suit against Philips, alleging gross fault (because, as a manufacturer of highly complex medical diagnostic equipment, Philips should be held to a heightened standard of care from which Philips grossly deviated) and several breach-of-contract causes of action: breach of obligation to provide a complete system that would fit NAZ's particular purposes, of which Philips was aware, in violation of Louisiana Civil Code article 2524; bad faith breach of contract in violation of Louisiana Civil Code article 1997; bad faith seller in redhibition in violation of Louisiana Civil Code article 2520; failure to make timely delivery in violation of Louisiana Civil Code article 2485; and breach of installation and service agreements.[53] NAZ seeks to recover various items of damages.[54]

On June 12, 2017, Philips moved for a more definitive statement regarding NAZ, LLC's members' identities to determine subject-matter jurisdiction.[55] Philips also moved to dismiss any

---

[49] *Id.* at 10.
[50] *Id.* at 14.
[51] *Id.*
[52] *Id.* at 10 & 14-15.
[53] R. Doc. 1.
[54] *Id.*
[55] R. Doc. 11.

claims arising from an alleged contract of sale, and alternatively sought a more definite statement of those claims.[56] On July 26, 2017, the Court granted the motion in part, ordering NAZ to amend the complaint to identify the citizenship of its members, but the Court denied the motion insofar as Philips sought to dismiss the breach-of-contract claims and sought a more definite statement.[57]

On September 1, 2017, NAZ filed a supplemental motion for leave to file an amended complaint, seeking to correct the jurisdictional allegations as to its members, add Dr. Shamsnia and Ad Neuro as plaintiffs, demand a jury trial, and assert claims for fraud, fraudulent inducement, and violations of the Louisiana Unfair Trade Practices Act ("LUTPA") against Philips.[58] NAZ's fraud, fraudulent inducement, and LUTPA claims were premised on allegations that Philips did not disclose that the MRI equipment was sold by Philips to PMC and then sold or leased to NAZ, and that this non-disclosure of "material" information was intended to induce Dr. Shamsnia into using PMC to finance the purchase of the MRI equipment.[59] The Magistrate Judge granted the motion as to adding Ad Neuro as a plaintiff, and denied the motion as to adding Dr. Shamsnia as a plaintiff.[60] Further, the Magistrate Judge denied the motion as to adding claims for fraud, fraudulent inducement, and violations of LUTPA against Philips finding that NAZ failed to show how the alleged omission caused any harm and that NAZ failed to allege facts with particularity showing that Philips intended to defraud NAZ.[61]

On November 2, 2017, Plaintiffs filed their first amended complaint.[62] Thereafter, Philips moved for judgment on the pleadings, or alternatively, summary judgment, as to

---

[56] *Id.*
[57] R. Doc. 25.
[58] R. Doc. 36. Previously, on August 3, 2017, NAZ had filed a motion for leave to file an amended complaint, R. Doc. 27, which the Magistrate Judge denied as moot after NAZ filed the supplemental motion for leave to file an amended complaint, R. Doc. 37.
[59] R. Doc. 45 at 10.
[60] *Id.* at 7-9.
[61] *Id.* at 12-13.
[62] R. Doc. 47.

plaintiffs' $850,000 claim for property damage arising from the allegedly faulty repair of the MRI equipment.[63]  Philips argued that Plaintiffs' property damage claim arises under the LPLA and is prescribed.[64]  Philips also moved to dismiss Plaintiffs' claims for punitive, exemplary, non-pecuniary, and economic loss damages.[65]  The Court denied Philips' motion seeking dismissal of the property damage claim; granted Philips' motion seeking dismissal of Plaintiffs' claims for punitive, exemplary, and non-pecuniary damages; and denied Philips' motion to dismiss Plaintiff's claims for economic loss damages.[66]

On May 4, 2018, Plaintiffs filed a motion for leave to file a second amended complaint, again seeking to assert claims for fraud, fraudulent inducement, fraud by silence, and violations of LUTPA.[67]  These fraud-based claims concerned Revision 12.[68]  Plaintiffs' purported second amended complaint alleges that, on May 14, 2012, Philips sent Revision 12 to Dr. Shamsnia, without explaining that items were removed from Revision 12 that had been included in Revision 10, and requiring him to sign Revision 12 while he was travelling.[69]  Plaintiffs allege that it was difficult for Dr. Shamsnia to compare Revision 10 with Revision 12 to ascertain the differences because the documents are approximately 50 pages each.[70]  The Magistrate Judge denied Plaintiffs' motion, finding that the fraud-based claims, including the LUTPA claim, in the purported second amended complaint are futile.[71]  The Magistrate Judge reasoned that Philips did not attempt to defraud Plaintiffs because Dr. Shamsnia had the full copies of Revision 10 and Revision 12 that he could have read and compared to discover the differences.[72]  Plaintiffs

---

[63] R. Doc. 51.
[64] R. Doc. 51-1.
[65] R. Doc. 61.
[66] R. Doc. 90.
[67] R. Doc. 101.
[68] R. Doc. 101-3 at 16-21.
[69] *Id.*
[70] *Id.*
[71] R. Doc. 156 at 7-8.
[72] *Id.*

appealed the Magistrate Judge's denial of their motion for leave to file the second amended complaint, arguing that the purported fraud-based claims involving Revision 12 are not futile and that the Magistrate Judge erred by considering material outside of the proposed amended complaint.[73]

Between August 21, 2018, and September 4, 2018, Philips filed several motions, including three motions for summary judgment concerning Plaintiffs' redhibition claims and the application of the LPLA, and a motion to strike Plaintiffs' jury demand on the grounds that Plaintiffs contractually waived their right to a jury trial.[74]

## II.    LAW & ANALYSIS

### a.  Philips' Motions for Summary Judgment (R. Docs. 139, 160 & 163)

Philips filed three motions for summary judgment.  Philips moves for summary judgment on Plaintiffs' property damage claim, arguing that the claim is governed by the LPLA, and is prescribed.[75]  Philips also moves for summary judgment on Plaintiffs' redhibition claim, arguing that it is prescribed.[76]  Finally, Philips argues that all of the claims raised in Plaintiffs' first amended complaint, except for the breach-of-contract claim related to the computer software and hardware and bad faith breach-of-contract claim, are subsumed by the LPLA or redhibition law, and thus, are prescribed.[77]  As to the bad faith breach-of-contract claim, Philips argues that there is no evidence of its acting in bad faith.[78]

---

[73] R. Doc. 180.
[74] R. Doc. 139, 141, 160 & 163.
[75] R. Doc. 139.
[76] R. Doc. 160.
[77] R. Doc. 163. Philips' arguments related to the LPLA depend upon whether the parties entered into a written contract and what the terms of that contract were.  The determination of that issue affects how the Court views Philips' motions for summary judgment related to the application of the LPLA.
[78] *Id.*

### (i) Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court

must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, __, 134 S. Ct. 1861, 1866 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Nor must the court consider uncited evidence in the record. Fed. R. Civ. P. 56(c)(3).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### (ii)    Prescription of LPLA Claim Related to Property Damage (R. Doc. 139)

Philips moves for summary judgment on Plaintiffs' claim related to the property damage sustained by the medical facility after the rain storm in January 2015, which claim Philips contends is encompassed by the LPLA. Philips characterizes Plaintiffs' claim as arising from the alleged movement of the MRI equipment after it was installed, which allowed for water to enter

the building resulting in the damages.[79]  Philips argues that, when viewed in this manner, Plaintiffs' allegations frame an LPLA claim in that the use of the MRI equipment resulted in damage to the building.[80]  Philips further argues that, because the movement of the MRI equipment was discovered on January 12, 2015, and Plaintiffs filed their lawsuit more than a year later, on April 4, 2017, Plaintiffs' property damage claim is prescribed.[81]

Plaintiffs respond that their property damage claim is not an LPLA claim arising from the sale and use of the MRI equipment, but rather a breach-of-contract claim arising from the Philips engineers' allegedly faulty repair of the MRI equipment.[82]  Plaintiffs argue that the Philips engineers' repair of the MRI equipment in January 2015 was performed pursuant to a separate agreement that was neither a warranty nor service agreement entered as part of the initial sale.[83]

In that vein, Plaintiffs argue that the originating sale, or contract to sell the MRI package, was formed on December 30, 2011, when Dr. Shamsnia and Philips agreed on the price and the thing, and the date on which Dr. Shamsnia signed Revision 10.[84]  Revision 10 had attached to it Philips' standard "Terms and Conditions of Sale," which includes a product warranty.[85]  However, Plaintiffs argue that Dr. Shamsnia's signature to Revision 10 signified only Plaintiffs' agreement to the scope and price of the MRI package and did not bind Plaintiffs to Philips' standard terms and conditions.[86]  Plaintiffs further argue that Dr. Shamsnia did not agree to bind Plaintiffs to Philips' terms and conditions by signing page 2 of Revision 12, although the document states that it is subject to Philips' standard "Terms and Conditions of Sale," because Dr. Shamsnia expressly denoted that his assent was subject to Plaintiffs' prior agreement with

---

[79] R. Doc. 139-1 at 12.
[80] Id.
[81] Id. at 12-13.
[82] R. Doc. 193 at 8-9 & 11-12.
[83] Id. at 11-12.
[84] R. Doc. 193 at 14 & R. Doc. 139-5 at 38.
[85] Id. at 40.
[86] R. Doc. 193 at 2 & 14.

Philips.[87]  Thus, Plaintiffs argue that the work Philips did on the MRI equipment in January 2015 was not done pursuant to a warranty as a part of the sale, but was done pursuant to a separate service agreement the parties entered.[88]  Therefore, Plaintiffs insist that their property damage claim arises from Philips' breach of that alleged separate service agreement as a result of the Philips engineers' defective work, and thus their claim does not arise under the LPLA.[89]

Philips previously raised in its motion for judgment on the pleadings, or alternatively, motion for summary judgment on Plaintiffs' property damage claim, the same argument it puts forth in the pending motion for summary judgment.[90]  In ruling on that motion, the Court explained the applicable law as follows:

> The LPLA provides "the exclusive theories of liability for manufacturers for damage caused by their products."  La. Rev. Stat. § 9:2800.52.  "Damage" is defined as "all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1, and 2315.2 allow recovery," including "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,' does not allow recovery for such damage or economic loss," and excluding attorneys' fees.  La. Rev. Stat. § 9:2800.53(5).  In other words, a plaintiff must bring an action under the LPLA to recover all damages caused by a product, except for damage to the product itself and economic loss sought under the Chapter 9 Redhibition articles. *See generally* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565 (1989).  Grappling with the plain language of the statute and comments to the Civil Code, courts have struggled to define the scope of this carve-out.  *See, e.g., C-Innovation, LLC v. Norddeutsche Seekabelewerke GMBH*, No. 10-4441, 2013 WL 990026, at *4-5 (E.D. La. Mar. 13, 2013); *Hollybrook Cottonseed Processing, LLC v. Carver, Inc. (Hollybrook I)*, No. 09-0750, 2010 WL 892869, at *6-8 (W.D. La. Mar. 11, 2010).  Nevertheless, there is a consensus that the LPLA does not preclude a redhibitory action against the manufacturer seeking economic loss damages.  *See, e.g., Am. Home Assurance Co. v. Oceaneering Int'l, Inc.*, 609 F. App'x 171, 176-78 (5th Cir. 2015); *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 900 (5th Cir. 2010); *Hollybrook Cottonseed Processing, LLC v. Carver, Inc. (Hollybrook II)*, No. 09-0750, 2010 WL 2195685, at *4-5 (W.D. La. May 28, 2010); *Hollybrook I*, 2010 WL 892869,

---

[87] R. Doc. 193 at 14 & R. Doc. 139-9 at 2.
[88] *Id.* at 10-14.
[89] *Id.*
[90] *See* R. Doc. 51.

at *6-7; *Aucoin v. S. Quality Homes, LLC*, 2007-1014, p. 7 n.8 (La. 2/26/08); 984 So. 2d 685, 691 n.8.

Where a plaintiff seeks to recover against the manufacturer for damages other than economic loss in redhibition, the cause of the damage determines the LPLA's preclusive effect. *Hollybrook II*, 2010 WL 2195685, at *4; *see also Hollybrook I*, 2010 WL 892869, at *7. Where a plaintiff does not seek damages caused by the product itself, but, rather, seeks damages based on contractual obligations beyond the scope of the express or implied warranty for redhibition, courts have found that the LPLA does not preclude such an action. *See, e.g., C-Innovation LLC*, 2013 WL 990026, at *6-7 (denying a motion to dismiss a fraud-based contractual claim against the manufacturer, reasoning that "[t]he economic damages C-Innovation is seeking are not by virtue of an action in redhibition and are not caused by the product itself"); *Jack B. Harper Contractor, Inc. v. United Fiberglass of Am., Inc.* (*Harper II*), No. 11-20, 2013 WL 12238500, at *2, *7 (E.D. La. Jan. 30, 2013) (noting that the jury found the manufacturer liable for breach of a contractual obligation to provide installation instructions in addition to liability under two prongs of the LPLA); *Jack B. Harper Contractor, Inc. v. United Fiberglass of Am., Inc.* (*Harper I*), No. 11-20, 2012 WL 2087394, at *2 (E.D. La. June 8, 2012) (denying summary judgment due to "an issue of fact as to whether Harper's claims fall solely within the LPLA"); *Hollybrook I*, 2010 WL 892869, at *7 (granting summary judgment in the defendant's favor on breach of contract claims arising from allegedly defective equipment, but denying defendant's request for summary judgment as to plaintiff's claims sounding in contract, where the contract called for providing equipment to process a certain daily capacity of cottonseed, as well as "certain engineering, repair, and training services"), *accord Hollybrook II*, 2010 WL 2195685, at *3 (clarifying that the court in *Hollybrook I* found "that the LPLA precludes Hollybrook's general breach of contract claims *to the extent they seek damages caused by Carver's products*") (emphasis added).

To determine whether the LPLA bars a particular breach of contract cause of action, the focus is on whether the plaintiff alleges that the damage was caused by the manufacturer's product:

> While the exclusivity provision of the LPLA leaves no doubt breach of contract claims against manufacturers for damages caused by their products are subsumed by the LPLA, in cases where a specific part of the injury is caused *only* by the breach of contract, and not by the product itself, a buyer might be able to bring both types of claims against a manufacturer. . . . [I]n the limited circumstances where a buyer sues a manufacturer for economic damages not covered in redhibition and not caused by the product itself, it may bring a breach of contract claim for those damages, on its own or in addition to a claim for other damages under the LPLA or redhibition.

*Hollybrook I*, 2010 WL 892869, at *7. Thus, when the source of damage is not the product itself but, for instance, a fraudulent misrepresentation made by the manufacturer, or a failure to provide services in breach of a contract separate and apart from the contract of sale, a plaintiff may bring this distinct claim alongside or independently from an LPLA claim. *See C-Innovation, LLC*, 2013 WL 990026, at *6-7; *Hollybrook I*, 2010 WL 892869, at *7. In this context, the LPLA has not precluded a breach of a contract to provide repairs, nor a claim for negligent repair against a manufacturer that would be vicariously liable for its employees' negligent repair. *Hollybrook I*, 2010 WL 892869, at *7; *see Debose v. Sam's East, Inc.,* No. 09-05, 2010 WL 11468975, at *1-2, *4 n.1 (M.D. La. Sept. 3, 2010).

On the other hand, when damage is caused by the product, the LPLA applies to preclude all actions (besides the Chapter 9 carve-out), regardless of the theory of liability. *Hollybrook II*, 2010 WL 2195685, at *4-5; *see also Am. Zurich Ins. Co. v. Caterpillar, Inc.,* 2012-270, pp. 6-7 (La. App. 3 Cir. 10/3/12); 99 So. 3d 739, 743-44 (holding that the LPLA precluded a breach of contract claim where "no claim relative to the service contract . . . would withstand distinction from a straight-forward defective product claim"). In this context, the LPLA has precluded claims for breach of contract and negligent repair. *Stroderd v. Yamaha Motor Corp., U.S.A.,* No. 04-3040, 2005 WL 2037419, at *2 (E.D. La. Aug. 4, 2005). Moreover, the buyer may not recover damage to other property besides the product itself that was caused by the defective product. *Chevron USA, Inc.,* 604 F.3d at 900-01.[91]

Applying this law to the instant suit, the Court denied Philips' motion for judgment on the pleadings, or alternatively, for summary judgment, observing that Plaintiffs alleged that their property damage was caused by the Philips engineers' breach of their obligation to repair the MRI equipment under a service agreement that was "separate and apart from the contract of sale and redhibitory warranty."[92] Thus, the Court held that Plaintiffs' property damage claim was not subsumed by the LPLA because Plaintiffs alleged that "it was not the MRI alone that caused the Plaintiffs to sustain water damage."[93] The Court further noted that it was "premature to consider summary judgment where the parties dispute the existence of a contract."[94]

---

[91] R. Doc. 90 at 19-23 (footnotes omitted).
[92] *Id.* at 26.
[93] *Id.* at 28.
[94] *Id.*

At this time, there are outstanding issues of material fact that preclude summary judgment on Philips' assertion that Plaintiffs' property damage claim arises under the LPLA and is prescribed.  First, there is a dispute as to the cause of the property damage.  Philips argues that the property damage was caused by the movement of the MRI equipment during use, which allowed for water to enter the building.[95]  Plaintiffs, on the other hand, contend that the property damage was caused by the Philips engineers' improperly performing the quenching process, which caused a hole in the roof that allowed water to enter the building.[96]  Second, there is a dispute as to whether the quenching process was performed under a warranty attending the sale or under a separate service agreement confected after the initial sale.  If Philips is correct that the damage was caused by the movement of the MRI equipment during use and that the repair work was done pursuant to a warranty flowing from the sale, then the LPLA would apply.  However, if Plaintiffs are correct that the damage was caused by the engineers' actions during the quenching process and the work was performed pursuant to a separate service agreement, then the LPLA does not apply.  Due to these disputed issue of material fact, Philips' motion for summary judgment regarding the prescription of Plaintiffs' "LPLA claim" related to the property damage is DENIED.

### (iii) Prescription of Redhibition Claim (R. Doc. 160)

Philips argues that Plaintiffs' redhibition claim has prescribed because Philips tendered the MRI equipment back to Plaintiffs on February 26, 2016, after the repair, and that Plaintiffs filed suit more than a year later, on April 4, 2017.[97]  Plaintiffs argue that their redhibition claim has not prescribed because they did not discover that the MRI equipment was not properly repaired until sometime after April 4, 2016.[98]  Plaintiffs also assert that the MRI equipment was

---

[95] R. Doc. 139-1 at 12.
[96] R. Doc. 47 at 8.
[97] R. Doc. 160-1 at 6-7.
[98] R. Doc. 196 at 5-6.

not employed in clinical use until after April 4, 2016, due to Philips' failure to deliver the extended workstation.[99]

Under Louisiana law, a "seller warrants [a] buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. A seller that manufactures the thing it sells, such as Philips, is deemed to know that the thing it sells has a redhibitory defect. La. Civ. Code art. 2545. Prescription for a seller that is deemed to know of a redhibitory defect runs "one year from the day the defect was discovered by the buyer." La. Civ. Code art. 2534(B). However, "prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day [it] tenders [the thing] back to the buyer or notifies the buyer of [its] refusal or inability to make the required repairs." La. Civ. Code art. 2534(C). "[I]f the repair attempt is believed to have corrected the redhibitory defect, the prescription in favor of the seller does not begin to run again until the defects reappear and are discovered to be such by the buyer." *Brown v. Dauzat*, 157 So. 2d 570, 574 (La. App. 1963) (citing *Hermeling v. Whitmore*, 140 So. 2d 257 (La. App. 1961)); *see also Panagiotis v. Gauthier-Matherne Homes, Ltd.*, 571 So. 2d 881, 883 (La. App. 1990) (same); *McKneely v. Don Coleman Const. Co., Inc.*, 441 So. 2d 497, 499 (La. App. 1983) (same). "The burden of proof is normally on the party pleading prescription; however, if on the face of the petition it appears that prescription has run ... the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period." *Younger v. Marshall Indus., Inc*., 618 So. 2d 866, 869 (La. 1993).

Philips tendered the MRI equipment back to Plaintiffs on February 26, 2016, and Plaintiffs filed suit more than a year later. Thus, it appears on the face of the complaint that prescription has run. As a result, Plaintiffs have the burden of proving that it has not. Plaintiffs have carried their burden by establishing that there are disputed issues of material fact regarding

---

[99] *Id.*

when the alleged redhibitory defect reappeared and when Plaintiffs discovered that Philips did not fix the problem.  First, Plaintiffs' purported expert in material sciences, Dr. Thomas L. Read, stated in his affidavit that the MRI equipment has never been properly repaired in terms of movement and is still not fit for its intended use.[100]  In addition, on November 13, 2017, and January 12, 2018 (dates after this suit was filed), Plaintiffs requested that Philips provide service on the MRI equipment because Plaintiffs think it is still moving.[101]  Philips contends that the MRI equipment is fit for its intended use and Plaintiffs have used it to conduct MRI exams.[102]  The question of when Plaintiffs discovered that Philips' repair did not fix the alleged redhibitory defect, so as to commence the running of prescription anew, is a factual issue that cannot be resolved on a motion for summary judgment.  Therefore, Philips' motion for summary judgment regarding Plaintiffs' redhibition claim is DENIED.

### (iv)    Preclusive Effects of LPLA and Redhibition (R. Doc. 163)

Philips argues that all of the claims raised in Plaintiffs' first amended complaint, except for the breach-of contract claim related to the computer software and hardware and bad faith breach-of-contract claim, are subsumed by the LPLA or redhibition, and thus, prescribed.[103]  As explained above, there remain disputed issues of material fact pertinent to determining whether Plaintiffs' claims are encompassed by the LPLA – specifically, what caused the damage to the MRI equipment and whether the parties entered into a service contract that was separate and apart from the initial sale.  Further, there remain disputed issues of material fact that preclude summary judgment on Plaintiffs' redhibition claim – specifically, when Plaintiffs discovered that Philips' repair did not fix the alleged defect.

---

[100] R. Doc. 196-3 at 1-2.
[101] *See* R. Doc. 196-4.
[102] R. Doc. 206 at 3.
[103] R. Doc. 163.

As to the bad faith breach-of-contract claim, Philips argues that there is no evidence of its acting in bad faith.[104]  However, Plaintiffs point to evidence of alleged misrepresentations made by Philips' employees as to the price, the exact package Plaintiffs purchased, quote revisions, and the movement of the MRI equipment, that Plaintiffs contend demonstrates Philips' bad faith breach of the contract.[105]  As discussed above, there are numerous disputed issues of material fact regarding the terms and scope of the parties' contract or contracts, and these issues must be resolved before it can be determined whether Philips breached any contract(s) in bad faith.

For these reasons, Philips' motion for summary judgment on the preclusive effects of the LPLA and redhibition is DENIED.

### b.  Philips' Motion to Strike Plaintiffs' Jury Demand (R. Doc. 141)

Philips moves to strike Plaintiffs' jury demand, arguing that Plaintiffs contractually waived the right to a jury trial.  Philips contends that, by accepting the MRI equipment, Plaintiffs assented to Philips' standard "Terms and Conditions of Sale," which include the following provision:

> EACH PARTY, KNOWINGLY AND AFTER CONSULTATION WITH COUNSEL, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM ARISING WITH RESPECT TO THIS AGREEMENT OR ANY MATTER RELATED IN ANY WAY THERETO.[106]

The Seventh Amendment to the Constitution of the United States preserves the right to a jury trial in civil suits.  U.S. Const. amend. VII; *see also* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution – or as provided by a federal statute – is preserved to the parties involved.").  However, the right to a jury trial can be waived by prior written agreement of the parties.  *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 755

---

[104] *Id.*
[105] R. Doc. 195 at 8-9.
[106] R. Doc. 141-1 at 2-3.

(6th Cir. 1985). A written agreement waiving the right to a jury trial is enforceable if the waiver was made knowingly, voluntarily, and intelligently. *Jennings v. McCormick*, 154 F.3d 542, 545 (5th Cir. 1998). Courts consider the following factors to determine whether a waiver of a jury trial has been made knowingly and voluntarily: "(1) whether the terms of the contract were negotiable, (2) the conspicuousness of the jury waiver provision, (3) the relative bargaining power of the parties, (4) whether [the waiving party] was represented by counsel, and (5) [the waiving party's] business acumen." *Evans v. Union Bank of Switzerland*, 2003 WL 21277125, at *2 (E.D. La. May 30, 2003) (quoting *Pellerin Constr., Inc. v. Witco Corp.*, 2001 WL 258056, at *1 (E.D. La. Mar. 14, 2001)). As noted by the Fifth Circuit, "[t]he right of jury trial is fundamental, [and] courts [must] indulge every reasonable presumption against waiver." *Jennings*, 154 F.3d at 545.

As discussed above, Philips' standard "Terms and Conditions of Sale" were attached to both Revision 10 and Revision 12, which Dr. Shamsnia received on Plaintiffs' behalf.[107] However, Plaintiffs contend that Dr. Shamsnia never agreed to the terms and conditions, that Revision 10 merely reflects the price and thing agreed upon, that Revision 12 was merely a counteroffer, and that neither was a contract outlining the terms and conditions of sale.[108]

Under Louisiana law, the formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and (4) a lawful cause. La. Civ. Code arts. 1918, 1927, 1966, 1971 & 2029. A sales contract also requires the parties' agreement on the thing and the price. *Id.* art. 2439. A contract is formed by a meeting of the minds as expressed through offer and acceptance. *Id.* art. 1927. To form a contract, an acceptance must conform to the offer; otherwise it is a counteroffer. *Id.* art. 1943. A modification in the purported acceptance of an

---

[107] R. Doc. 141-1 at 2-3.
[108] R. Doc. 187 at 15. Interestingly, although Plaintiffs contend that they never agreed to Philips' standard "Terms and Conditions of Sale" that were part of the Revision 10 Dr. Shamsnia signed, Plaintiffs allege that Revision 10 is the version of the contract to which they agreed in terms of the price and scope of what they thought they were purchasing. *See* R. Doc. 47.

offer constitutes a new offer which must be accepted by the other party in order to create a binding contract. *Rodrigue v. Gebhardt*, 416 So. 2d 160 (La. App. 1982).

In this case, there are disputed issues of material fact regarding whether the parties entered into a written contract that incorporates Philips' standard "Terms and Conditions of Sale," which include the waiver of a jury trial. Plaintiffs contend that they did not agree to any of the written terms and conditions of sale, and Philips cannot point to an undisputed writing that establishes otherwise. Thus, Philips has not demonstrated that Plaintiffs knowingly and voluntarily waived their right to a jury trial. Whether Plaintiffs waived their right to a jury trial is entirely dependent on whether the parties had a written contract and what the terms of any such contract are. These are questions the fact-finder, *i.e.* the jury, must answer. However, if the jury finds that either Revision 10 or Revision 12, which both include the jury waiver clause, is the parties' contract, then the Court will determine, in accordance with the five-factor test, whether Plaintiffs' jury waiver was made knowingly and voluntarily. If the Court finds that Plaintiffs made the jury waiver knowingly and voluntarily, the remainder of the issues must be tried in a bench trial.

Therefore, for now, Philips' motion to strike Plaintiffs' jury demand is DENIED. The trial of this matter will proceed in two phases. First, the jury will be asked to determine whether the parties entered into a written contract concerning the purchase of the MRI equipment and package, and if so, what the terms of that contract are. If the jury finds that Philips' standard "Terms and Conditions of Sale" were incorporated into a written contract that binds the parties, the Court will determine if Plaintiffs knowingly and voluntarily waived the jury; and if they did, the remainder of the issues will be tried in a bench trial. On the other hand, if the jury finds that Philips' standard "Terms and Conditions of Sale" were not incorporated into a binding written

contract or the Court finds that Plaintiffs' jury waiver was not made knowingly and voluntarily, then the remainder of the issues will be tried by the jury.

### c. Plaintiffs' Appeal of the Magistrate Judge's Decision (R. Doc. 180)

Plaintiffs seek review of the Magistrate Judge's denial of Plaintiffs' motion for leave to file a second amended complaint to assert claims for fraud, fraudulent inducement, fraud by silence, and violations of LUTPA related to Dr. Shamsnia's signing page 2 of Revision 12.

Magistrate judges are empowered to "hear and determine" certain non-dispositive pretrial motions, including a motion for leave to amend the complaint. 28 U.S.C. § 636(b)(1)(A); *see also PYCA Indus., Inc. v. Harrison Co. Waste Water Mgmt. Dist.*, 81 F.3d 1412, 1421 n.11 (5th Cir. 1996). If a party is dissatisfied with a magistrate judge's ruling, it may appeal to the district court. Fed. R. Civ. P. 72(a). When a timely objection is raised, the district court will "modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(A). The court reviews the magistrate judge's "factual findings under a clearly erroneous standard, while legal conclusions are reviewed *de novo*." *Moore v. Ford Motor Co.*, 755 F.3d 802, 806 (5th Cir. 2014) (internal citation omitted). A factual "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Courts are to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court has held that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, leave to amend is not automatic. *Halbert v. City of Sherman*, 33 F.3d 526, 529 (5th Cir. 1994). Courts consider multiple factors, including "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182. An amendment is futile if it would be dismissed under a Rule 12(b)(6) motion. *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

The Magistrate Judge correctly found that amendment would be futile because Plaintiffs' proposed amended complaint does not add new theories of recovery under which Plaintiffs could recover. The fraud-based allegations of the proposed second amended complaint revolve around Philips' presentation of Revision 12 to Dr. Shamsnia and his signing that document.[109] Plaintiffs allege that Philips never explained to Dr. Shamsnia how Revision 12 differed from Revision 10.[110] However, Plaintiffs do not allege that Dr. Shamsnia was not given a complete copy of Revision 12.[111] Indeed, Plaintiffs' counsel admitted to the Magistrate Judge at oral argument on the motion for leave to amend that Dr. Shamsnia had copies of both Revision 10 and Revision 12 at the time he signed page 2 of Revision 12.[112] The Magistrate Judge correctly concluded that Dr. Shamsnia, a highly educated person, could have read Revision 12 and compared it to Revision 10 to ascertain the differences; thus, Philips did not attempt to conceal information from Dr. Shamsnia as would constitute fraud or violations of LUTPA.[113] Therefore, the Magistrate Judge's order denying Plaintiffs' motion for leave to file a second amended complaint is neither clearly erroneous nor contrary to law and, consequently, is AFFIRMED.

## III. CONCLUSION

Accordingly, IT IS ORDERED that Philips' motion for partial summary judgment regarding prescription of Plaintiffs' LPLA claim, R. Doc. 139, is DENIED;

---

[109] *See* R. Doc. 180-2.
[110] *Id.* at 16-21.
[111] *See* R. Doc. 180-2.
[112] R. Doc. 200 at 33. The Court is not now making any determinations regarding the import of Dr. Shamsnia's signature on page 2 of Revision 12, which constitutes yet another factual dispute between the parties.
[113] R. Doc. 156 at 7-8.

IT IS FURTHER ORDERED that Philips' motion for partial summary judgment regarding prescription of Plaintiffs' redhibition claims, R. Doc. 160, is DENIED;

IT IS FURTHER ORDERED that Philips' motion for partial summary judgment regarding the preclusive effects of the application of the LPLA and Louisiana redhibition law, R. Doc. 163, is DENIED;

IT IS FURTHER ORDERED that Philips' motion to strike Plaintiffs' jury demand, R. Doc. 141, is DENIED; and

IT IS FURTHER ORDERED that the Magistrate Judge's order denying Plaintiffs' motion for leave to file a second amended complaint, R. Doc. 156, is AFFIRMED.

New Orleans, Louisiana, this 7th day of November 2018.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE