UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NAZ, LLC | CIVIL ACTION NO. 2:17-cv-02882 |
| *Plaintiff,* | |
| | JUDGE BARRY W. ASHE |
| VERSUS | |
| PHILIPS HEALTHCARE, A DIVISION OF PHILIPS ELECTRONICS NORTH AMERICA CORPORATION | MAG. KAREN WELLS ROBY |
| *Defendant* | |

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PLAINTIFFS' EXPERT THOMAS READ PURSUANT TO FEDERAL RULES OF EVIDENCE RULE 702 AND THE DAUBERT STANDARD

Philips Healthcare ("Philips") submits this Memorandum in Support of its Motion to Strike the Testimony of Thomas Read Pursuant to Federal Rules of Evidence Rule 702 and the *Daubert* Standard. Plaintiffs have submitted a report from Thomas Read, who Plaintiffs intend to offer as an expert in this matter. Dr. Read should be precluded from testifying on several bases. First, Dr. Read is not qualified to testify as an expert in any aspect of this case, because, by way of education, training, and experience, he is not an expert with regard to MRIs, their siting, or installation. Second, the report includes opinions that are not reliable because his opinions are not based on data or calculations, academic publications or studies, or any testing to verify his theories, and therefore his methodology is not reliable. Third, his opinions will not assist the trier of fact because they include conclusions that will mislead and confuse the jury.

Consequently, Dr. Read fails to satisfy the standards of expert testimony provided in Federal Rules of Evidence rule 702 and established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and his testimony and opinions should be excluded from the trial of this matter.[1]

## Factual Background

Plaintiffs filed the above-referenced lawsuit on April 4, 2017, seeking various damages resulting from their purchase of a Philips Ingenia 3.0T MRI (the "MRI").[2] Specifically, Plaintiffs allege that in December 2011 through their representative, Dr. Morteza Shamsnia, they "signed a 'quote' document which set forth the price and components, packages and services Philips promised to deliver" to be included in their purchase of the MRI.[3] Throughout the negotiations outlined above, Plaintiffs were building the medical clinic that included a MRI suite that would house the MRI. Plaintiffs refused offers from Philips to complete the MRI suite as a "turnkey" project.[4] Instead, Plaintiffs directly hired Travis Dean of Lee Shielding to install an RF room[5] within the MRI suite per Philips' recommended specifications.[6]

Travis Dean attempted to follow Philips' specifications, but discovered that the dimensions of the MRI suite were not consistent with that shown on Philips' specifications. During a planning meeting with Dr. Shamsnia and his project manager, Mohammed Tareh, Travis Dean notified Dr. Shamsnia that the MRI suite was 4 to 5 inches shorter than required by the Philips' specifications.[7] Dr. Shamsnia then conferred privately with Mohammed Tareh and then instructed Travis Dean that the 4 to 5 inches did not matter, and to carry on and build the

---

[1] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[2] Rec. Doc. 1 at ¶3.
[3] *Id.*
[4] Exhibit 1, Tina Ray deposition at pp. 32-33.
[5] An RF room is a room covered in galvanized steel panels in which the MRI machine sits. It prevents radiofrequency waves from entering the area around the MRI machine and causing interference in the MRI machine's signal. See Exhibit 2, Travis Dean deposition, pp. 12-13.
[6] Exhibit 2, Travis Dean deposition, pp. 32-33.
[7] *Id.*, at pp. 29-31.

room.[8] The end result of this decision was that the MRI, which includes a seven-ton magnet, was placed closer to the steel RF shielding than specified by Philips.

After the RF room was built, Plaintiffs completed the MRI suite in time for a December 2014 installation. The MRI was installed in the MRI suite. Philips National Installation Specialist, Harry McDow, then conducted performance testing on the MRI.[9] After the MRI passed the requisite testing, the MRI was then turned over to the owner of Advanced Neurodiagnostics, Simin Mirtaheri, on December 22, 2014.[10]

On the morning of January 12, 2015, Plaintiffs' MRI technician, Alicia Bayard, experienced issues scanning with the MRI. She contacted Randy McLain, a field service engineer for Philips.[11] Bayard was advised to make a service call to Philips. Another Philips Service Engineer, Mitch Fontenot, arrived at the site on January 12, 2015.[12] He observed the MRI had moved. The MRI was quenched[13] on January 13, 2015, at approximately 9:30 a.m. due to safety concerns.[14] Following the quench, it was discovered by Philips that the dimensions of the MRI suite were smaller than recommended by its specifications, resulting in the MRI's seven-ton magnet being placed closer to the steel RF shielding than specified. On the morning of January 15, 2015, Plaintiffs' employees arrived at the MRI facility to find that rain water had leaked into the building causing damage to the building.[15]

---

[8] *Id.* at 29-30.
[9] Exhibit 3, Harry McDow deposition, p. 43.
[10] Exhibit 4, Medical Device Installation Record, Philips Production 000842-000848.
[11] Rec. Doc. 1.
[12] *Id.*
[13] Quenching is the releasing of helium from the MRI magnet in order to rapidly remove the magnetic field from the magnet. The helium exits the MRI through a quench pipe at approximately 4.2 degrees Kelvin and is exhausted to the exterior of the building. See Exhibit 3, Harry McDow Deposition at pp. 83-84.
[14] Exhibit 5, Randy McLain Deposition, p. 70.
[15] Rec. Doc. 1 at ¶19; Rec. Doc. 47 at ¶21.

Now, Plaintiffs have issued a report from Thomas Read in which Dr. Read makes various claims with regard to the subject MRI. For the reasons that follow, his opinions should be excluded from the trial of this matter.

# LAW

**A. Federal Rule of Evidence 702**

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702, which governs the admissibility of expert witness testimony:[16]

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[17]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[18] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[19] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[20]

---

[16] *Thomas v. W & T Offshore, Inc.*, No. CV 16-14694, 2018 WL 4462242, at *3 (E.D. La. Sept. 18, 2018).
[17] Fed. R. Evid. 702.
[18] 509 U.S. 579 (1993).
[19] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert*, 509 U.S. at 592–93).
[20] *Luwisch v. Am. Marine Corp.,* No. CV 17-3241, 2018 WL 3019019, at *1 (E.D. La. June 18, 2018).

### 1. An expert must be qualified.

The threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual is qualified to do so.[21] An expert witness must have such knowledge or experience as to make it appear that the opinion will aid the trier in his search for truth.[22] "With respect to qualifications, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training, or education than an ordinary person."[23] Further, the expert's qualifications must relate to the testimony to be provided.[24]

The proponent bears the burden of proof to show the testimony is reliable, relevant, and admissible.[25] To meet this burden, a proponent cannot simply rely on the expert's assurances that he has utilized generally accepted scientific methodology.[26] Rather, some objective, independent validation of the expert's methodology is required.[27] An expert witness should not be admitted to testify if the witness is not qualified to do so in a particular field or on a given subject.[28]

### 2. An expert's opinion is reliable if the reasoning or methodology underlying the testimony is scientifically valid.

Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert

---

[21] *Ehrenberg v. State Farm Mut. Auto. Ins. Co.,* No. CV 16-17269, 2018 WL 1757349, at *2 (E.D. La. Apr. 12, 2018), citing Fed. R. Evid. 702.
[22] *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quotations omitted).
[23] *Chatelain v. Akin*, No. CV 15-5747, 2018 WL 3063118, at *3 (E.D. La. Feb. 26, 2018), citing *Louviere v. Black & Decker U.S., Inc.*, No. 1:00CV597 (TH), 2001 WL 36385828, at *1 (E.D. Tex. Oct. 26, 2001). See also *Parker v. NGM Ins. Co.*, No. CV 15-2123, 2016 WL 3546325, at *2 (E.D. La. June 23, 2016).
[24] *Id*., citing *Jimenez v. United States, No. SA-5:13-CV-096-OLG, 2014 WL 3907773, at *1 (W.D. Tex. July 25, 2014).* See also *Parker v. NGM Ins. Co.*, No. CV 15-2123, 2016 WL 3546325, at *2 (E.D. La. June 23, 2016).
[25] *Moore v. Ashland Chem., Inc*., 151 F.3d 269, 276 (5th Cir.1998).
[26] *Martinez v. Offshore Specialty Fabricators, Inc*., No. CIV.A. 08-4224, 2011 WL 820313, at *2 (E.D. La. Mar. 2, 2011). See also *Parker v. NGM Ins. Co.*, No. CV 15-2123, 2016 WL 3546325, at *2 (E.D. La. June 23, 2016).
[27] *Id.*
[28] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quotations omitted). See also *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (internal citations omitted).

testimony is both reliable and relevant."[29] Such testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that it is based on recognized methodology and supported by appropriate validation based on what is known.[30]

A number of nonexclusive factors may be relevant to the reliability inquiry, including:

> (1) whether the technique has been tested,
> (2) whether the technique has been subjected to peer review and publication,
> (3) the potential error rate,
> (4) the existence and maintenance of standards controlling the technique's operation, and
> (5) whether the technique is generally accepted in the relevant scientific community.[31]

The reliability inquiry must remain flexible, because not every *Daubert* factor will be applicable in every situation, and a court has discretion to consider other factors it deems relevant.[32] The reliability determination and the factors taken into account are left to the discretion of the district court, consistent with its gatekeeping function under Rule 702.[33]

The expert's testimony must be reliable at each and every step or else it is inadmissible.[34] The reliability analysis applies to all aspects of an expert's testimony: the methodology, facts underlying the expert's opinion, link between the facts, and conclusion.[35] "Where the expert's opinion is based on insufficient information, the analysis is unreliable."[36] Scientific evidence is irrelevant when a great analytical gap between the data and the opinion proffered exists.[37]

---

[29] *Bell v. Foster Wheeler Energy Corp.*, No. CV 15-6394, 2017 WL 889047, at *1–2 (E.D. La. Mar. 6, 2017), citing *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).
[30] *Saacks v. Privilege Underwriters Reciprocal Exch.*, No. CV 16-1149, 2017 WL 3867761, at *1 (E.D. La. Feb. 2, 2017), citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 2790, 125 L. Ed. 2d 469 (1993).
[31] *Comardelle v. Pennsylvania Gen. Ins. Co.*, 76 F. Supp. 3d 628, 631 (E.D. La. 2015). See also *Watkins v. Telsmith*, Inc., 121 F.3d 984, 989 (5th Cir. 1997).
[32] *Guy v. Crown Equip. Corp*., 394 F.3d 320, 325 (5th Cir. 2004).
[33] *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).
[34] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).
[35] *Id.* (internal citations omitted).
[36] *Paz v. Brush Engineered Materials, Inc*., 555 F.3d 383, 388 (5th Cir. 2009).
[37] *Saacks v. Privilege Underwriters Reciprocal Exch.*, No. CV 16-1149, 2017 WL 3867761, at *1 (E.D. La. Feb. 2, 2017), citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Most important, the Supreme Court has advised that nothing in either *Daubert* or the Federal Rules of Evidence requires a court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.[38] A party cannot simply rely on an expert's assurances that he has utilized generally accepted scientific methodology.[39] Rather, some objective, independent validation of the expert's methodology is required.[40]

### 3. To be relevant, an expert's opinion must assist the trier of fact.

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant, including in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.[41] "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[42] Expert testimony should be excluded if the court finds that "the jury could adeptly assess [the] situation using only their common sense experience and knowledge."[43]

### B. Legal conclusions are impermissible.

Neither Rule 702 nor Rule 704 permits expert witnesses to offer conclusions of law.[44] The Advisory Committee notes make it clear that questions which would merely allow the

---

[38] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).
[39] *Porte v. Illinois Cent. R.R. Co.,* No. CV 17-5657, 2018 WL 4404063, at *1 (E.D. La. Sept. 14, 2018), citing *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998) (en banc ).
[40] *Id.*
[41] *Bocanegra v. Vicmar Servs., In*c., 320 F.3d 581, 584 (5th Cir. 2003).
[42] *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).
[43] *Lee v. Offshore Logistical & Transp., LLC,* No. CV 15-2528, 2017 WL 6501151, at *2 (E.D. La. Dec. 19, 2017), citing *Peters v. Five Star Marine Serv*., 898 F.2d 448, 450 (5th Cir. 1990).
[44] *Shell Offshore, Inc. v. ENI Petroleum US LLC*, No. CV 16-15537, 2018 WL 1705527, at *8 (E.D. La. Apr. 9, 2018).

witness to tell the jury what result to reach are not permitted.[45] According to prior Eastern District rulings, parties should anticipate that the Court will not admit expert testimony at trial that amounts to nothing more than a legal conclusion.[46]

## ARGUMENT

**A. Thomas Read is not qualified to testify as to the opinions set out in his expert report.**

Thomas Read's curriculum vitae asserts that he is a professional engineer and that he has litigation consulting experience in glass, metallurgy, accident reconstruction, OSHA worker safety, products liability, intellectual property, and factory safety.[47] He also claims manufacturing experience in several areas, including equipment design and build, machine design and safety, quality control, and materials engineering.[48]

While Dr. Read's experience indicates that he would likely qualify as an expert in one or more areas, his education, training and experience do not qualify him to testify as an expert in this case. Here, the issues include MRI sales, design and build of MRI suite and shielding, and design, siting and installation of an MRI. Dr. Read's qualifications give no indication that he has any experience in this highly specialized and complex field that lies at the intersection of physics and medicine. Based on Dr. Read's CV, he is not an expert in any area of relevance to the instant matter.[49]

Moreover, his education and training do not include the kind of highly specialized expertise in MRI function or MRI facility design and construction that is relevant to this case. His CV shows no special training, certification classes, or continuing education in any area relevant to the instant matter. Further, Dr. Read's disclosures include no indication that he has

---

[45] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). See also *Shell Offshore, Inc.* at *8.
[46] *Shell Offshore, Inc.* at *8.
[47] Exhibit 6, curriculum vitae of Thomas Read, Bates labelled Thomas L. Read, PhD CV 001-002
[48] *Id.* at 001-002.
[49] *Id.* at 001-002.

8

published a study on any subject relevant to the instant litigation, nor does he have experience with relevant industry standards and regulations.

In *St. Martin v. Mobil Expl. & Producing U.S. Inc.,* the Fifth Circuit found that a purported expert with experience in wetlands and wildlife management and marsh research was not qualified to testify in hydrology.[50] The expert had taken no hydrology courses and his only formal training in hydrology was from courses that touched on water pressure, water management, and water chemistry.[51]

Similarly, Dr. Read's claim to be a professional engineer does not provide any basis to believe that he has any education, training, or experience with MRIs, or their design or installation. Because the issues in this case involve MRI sales, design and build of MRI suite and shielding, and design, siting and installation of an MRI, Dr. Read is not an expert in any area of relevance to the instant matter. For these reasons, Dr. Read should be excluded from testifying in this case.

**B. Thomas Read's opinions fail to satisfy *Daubert* requirements and are unreliable.**

Dr. Read's opinions fail to satisfy the standards for expert testimony established in *Daubert* because his opinions – as set forth in his report – are disorganized, unsupported by reliable data or any cognizable methodology, and are likely to confuse the trier of fact. Therefore, he should be excluded from testimony.

First, Dr. Read's report suffers from a degree of disorganization that obscures the meaning and significance of his opinions. For example, he uses a format that includes a thematic

---

[50] Including hydrologic forces generated by barge bow waves, forces created by the waves in spoil bank gaps, and whether this force is sufficient to cause erosion, among other issues. *St. Martin v. Mobil Expl. & Producing U.S. Inc.*, 224 F.3d 402, 413 (5th Cir. 2000).
[51] *Id.*

9

subtitle followed by a numerical list of topics.[52] However, in many cases, the topics include either an opinion without support or a quotation without an opinion.[53] In one case, he merely asks a question without providing any context, explanation, or opinion: "How was the "safe distance" for the magnet isocenter from the wall determined without shear strength data?"[54] Dr. Read offers no explanation of the significance of this question, no basis for it, no calculations, no studies or published account of its significance – in short, nothing to support this query, which is not even an assertion. Rather, this question merely provides *the implication* that a mistake was made without actually opining that it was made or providing any basis for the suggestion. Therefore, this – and all unsupported statements from Dr. Read's report – should be excluded from testimony as unreliable.

Similarly unintelligible are Dr. Read's statements under "Quench."[55] After suggesting without support that "the ramp tool was onsite," Dr. Read includes a quotation that trails off ("At that point we decided to the situation [sic] to be extremely unsafe for the involved personnel and the").[56] The report then continues with No. 2 under "Quench," which verbatim reads: "Ramp down should have Jan 12, 2015 or early Jan 13 been, not the quench."[57]

Federal Rules of Civil Procedure Rule 26 mandates that an expert provide "a complete statement of all opinions the witness will express and the basis and reasons for them…"[58] The foregoing fails to meet the requirements of Rule 26, as no basis or reason for the statement is provided, no supporting data or documentation validate the statement. The statement itself is so flawed and impenetrable that it justifies exclusion of Dr. Read as an expert altogether.

---

[52] Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 001-004.
[53] *Id.*
[54] *Id.* at 003, number 4 at top of page.
[55] *Id.* at 003 (last sentence) and 004.
[56] Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 004, top of the page.
[57] *Id.*
[58] Fed. R. Civ. P. 26.

Second, Dr. Read's opinions are not supported by published accounts, studies, or other resources that support the claims made in the report. Though Dr. Read cites to documents that were produced during discovery, he offers no studies or sources that provide a verifiable basis for his claims, and he fails to apply any technique that has been generally accepted in any scientific community

The lone exception is a reference for a claim regarding the requirements for the exhaust pipe.[59] Two sources appear in the footnote. One source purporting to provide the transition temperature for silicone rubber is a Wikipedia page.[60] Wikipedia (the free online encyclopedia edited by users) is not a source that should be referenced by an expert who wishes to opine before a trier of fact about an abstruse scientific subject. A reliable expert would provide a published, peer-reviewed source that leaves no doubt as to the claim.

Third, Dr. Read's opinions are not supported by any discernable methodology. Indeed most of Dr. Read's claims are made without any support, explanation, or background whatsoever and appear to be a series of impressions formed based on the documentation he allegedly relies on. For example, his primary contention appears to be that the footpads (which he refers to as "vibration pads") contributed to the MRI's movement.[61] But Dr. Read provides no data, no calculations, no studies, nor any other foundation for his claim. Indeed, Dr. Read seems to have no methodology whatsoever, but instead cites an ambiguous passage from one of the thousands of pages of documents produced by Philips during discovery – a quote is offered without identifying the writer or source, and without support, calculations, explanation or context.[62]

---

[59] Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 001, No. 7 and the footnoted reference at the bottom of the page.
[60] *Id*.
[61] Exhibit 7, Expert report of Thomas Read, 001, No. 4.
[62] *Id*. at 002, No. 3.

Similarly flawed opinions appear throughout the report. For example, under "Installation," Dr. Read claims the best possible sealant was used to seal the vent pipe, and that any material would become brittle and fail during a quench.[63] He continues by averring that, "Philips required a flexible seal that would perform at -438ºF…No such material exists."[64] Again, no support for the claim appears, and no studies were relied on or calculations performed. He references no testing that supports his claim. Rather, Dr. Read expects the Court to take his musings at face value – without reliable sources, without data or calculations, and without any identifiable education, experience or training in the scientific area in which he offers his opinion.

Another example appears under "Re-installation," where Dr. Read notes that "Isocenter moved 9" further from the original plans. Unsure as whether 9 or 2.17m away…"[65] The statement is both unclear and baseless. Where a true expert would have inspected the facility and calculated the isocenter, Dr. Read seems satisfied with ambiguous assumptions. He then proceeds to make claims based on those assumptions, including about Philips' knowledge regarding the isocenter, the earthquake brackets, and z-force calculations, without providing any data or calculations to support his statements.[66]

In Dr. Read's report, the foregoing issues are not the exception but are, rather, the rule. This Court has previously articulated several factors that may be considered in determining the soundness of the scientific methodology, including:

> 1) whether the theory or technique can be and has been tested;
> 2) whether the theory or technique has been subjected to peer review and publication;
> 3) the known or potential rate of error and the existence and maintenance of standards; and

---

[63] *Id.* at 003, "Installation," No. 3.
[64] *Id.* at 003, "Installation," No. 3.
[65] *Id.* at 003, "Installation," No. 4.
[66] Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 003-004.

        4) whether the theory or technique used has been generally accepted.[67]

        Dr. Read's opinions fail to satisfy any of the foregoing factors, because he has no testable technique, relies on no published academic studies, presents no verifiable standards and no identifiable technique that has been generally accepted in any community, and fails to provide any data or calculations to support the report's claims. For these reasons, Dr. Read should be excluded from testifying in this case.

**C. Thomas Read's opinions will not assist the trier of fact and could lead to confusion of the issues.**

        For the foregoing reasons, Dr. Read's opinions also will not assist the trier of fact in making a determination as to any of the issues in this case. In fact, Dr. Read's opinions are much more likely to cause confusion and lead to prejudice against Philips, because of the weight to which the layman would assign to Dr. Read's "expert" testimony, even though his qualifications and analysis do not actually meet any standard of expertise.

        As noted, Dr. Read repeatedly puts forth inconclusive statements that imply faulty conduct without any actual basis or reliable claim.[68] Vague and unintelligible statements pervade Dr. Read's report.[69] Moreover, almost none of the claims are actually supported by any sources beyond out-of-context statements lifted from documentation identified only by Bates number. Conclusive opinions are repeatedly pronounced as fact without any identifiable basis, analysis, or

---

[67] *Hebbler v. Turner*, No. CIV.A. 03-388, 2004 WL 414821, at *2 (E.D. La. Mar. 3, 2004).
[68] See, *e.g.*, Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 002, No. 3c ("How were the mating parts handled?"), 003, No. 4 at top of page ("How was the "safe distance" for the magnet isocenter from the wall determined…?").
[69] Exhibit 7, Expert report of Thomas Read, Bates labelled Thomas Read 003 (last sentence) and 004, top. ("At that point we decided to the situation to be extremely unsafe for the involved personnel and the", and then, under "Quench," which reads: "Ramp down should have Jan 12, 2015 or early Jan 13been, not the quench.")

support.[70] And the report is missing the kind of sound methodology that is contemplated by the Rules of Evidence.

This Court has noted that the Supreme Court's overriding concern in *Daubert* was with the problem of exposing the jury to confusing and unreliable expert testimony.[71] This Court has held that fundamentally unsupported opinions "offer [ ] no expert assistance to the [trier of fact]" and should be excluded.[72] For example, in *Shawler v. Ergon Asphalt & Emulsions, Inc.*, the court found that a report not only offered the expert's:

> "opinions on issues not fit for expert testimony; he also fails to support conclusions on which expert testimony could otherwise be useful with any form of reasoning or methodology. An expert's self-proclaimed accuracy is insufficient to prove that his opinions are reliable and useful to the jury. ... The Court finds that admission of Caskey's opinions would **not only be unhelpful, but would also be harmful to the trier of fact**…. Indeed, the Court specifically finds that their probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Accordingly, Rule 403, as well as Rule 702, warrants the exclusion of Caskey's opinions.[73]

The same applies to Read's opinions. The opinions above are significantly disorganized and confusing and will mislead the jury about significant issues in this case. Because the opinions will not assist the trier of fact, Dr. Read cannot be allowed to testify in this manner.

---

[70] *Id.* at 001, No. 6, "Sloppy engineering. There was no margin of error for the MRI location"; 002, No. 3, a-d, "Process for gluing the two pads together"; 003, "Installation" No. 3, "Any sealing material would become brittle and fail during quench"; 003, "Initial Operation" No. 2 "…they were unaware of the forces created by the vibrations"; among others.
[71] *Atl. Specialty Ins. Co. v. Porter, Inc.*, No. CV 15-570, 2016 WL 6569346, at *3 (E.D. La. Nov. 4, 2016), aff'd, No. 16-31259, 2018 WL 3763263 (5th Cir. Aug. 7, 2018), citing *Daubert*, 509 U.S. at 595-97.
[72] *Id.*, citing *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).
[73] *Shawler v. Ergon Asphalt & Emulsions, Inc.*, No. 15-2599, 2016 WL 1019121, at *12 (E.D. La. Mar. 15, 2016), aff'd sub nom. *Shawler v. Big Valley, L.L.C.*, 728 F. App'x 391 (5th Cir. 2018) (emphasis added; internal citations omitted). See also, *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,* where the court found "no legal or factual evidence to support [expert] Nickerson's speculation that [the plaintiff] would or should have been paid a prevailing wage, and thus any testimony based on such a premise will not assist the trier of fact, but will likely serve only to confuse or mislead the jury. Therefore, Nickerson may not testify" as to his calculations. *Tajonera v. Black Elk Energy Offshore Operations*, L.L.C., No. CV 13-0366, 2016 WL 9414205, at *12 (E.D. La. May 23, 2016).

## **CONCLUSION**

In sum, Dr. Read's opinions fail to satisfy any of the standards set out in *Daubert*, because he is not qualified to testify regarding the facts and issues in this case. Furthermore, he has no testable, reliable method, he relies on no published academic studies, no industry norms, and no verifiable standards, and he fails to apply any technique that has been generally accepted in any scientific community. Because Dr. Read's opinions are formed without the benefit of testing and are not supported by any established peer-reviewed methodology, his opinions are not reliable and should be excluded. Also, his testimony should be excluded due to the danger of juror confusion, as his opinions are disorganized and at times even indecipherable. Finally, Dr. Read's transcript was received late last night.[74] Thus, Philips has not been able to fully identify testimony citations demonstrating Read's lack of support or methodology for his opinions. Philips intends to supplement this motion with relevant testimony citations from Dr. Read's deposition in further support of this motion. However, for these reasons above, Dr. Read should not be allowed to testify at trial in this matter.

Respectfully Submitted,

PERRIER & LACOSTE, L.L.C.

*/s/ Curt L. Rome*

_____
**GUY D. PERRIER, (#20323)**
**RODNEY J. LACOSTE, JR., (#19659)**
**CURT L. ROME, (#29406)**
**JORDAN M. JEANSONNE, (#33203)**
**JAMES H. JOHNSON, (#35848)**
One Canal Place
365 Canal Street, Suite 2550
New Orleans, Louisiana  70130
Telephone:  (504) 212-8820
Facsimile:  (504) 212-8825

---

[74] See Exhibit 8.

Email: gperrier@perrierlacoste.com
rlacoste@perrierlacoste.com
crome@perrierlacoste.com
jjeansonne@perrierlacoste.com
jjohnson@perrierlacoste.com

**ATTORNEYS FOR PHILIPS HEALTHCARE, A DIVISION OF PHILIPS ELECTRONICS NORTH AMERICA CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been delivered to all counsel of record, either through the CM/ECF system, depositing a copy of same in the United States mail, first class postage prepaid, by hand delivery or by facsimile transmission at their last known address of record, this 27th day of November, 2018.

*/s/ Curt L. Rome*

**CURT L. ROME**