UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NAZ, LLC, ET AL. | CIVIL ACTION |
| VERSUS | NO. 17-2882 |
| PHILIPS HEALTHCARE, A DIVISION OF PHILIPS ELECTRONICS NORTH AMERICA CORPORATION | SECTION: M (4) |

## ORDER & REASONS

Before the Court are several motions for summary judgment filed by defendant Philips Healthcare ("Philips"),[1] a Division of Philips Electronics North America Corporation, to which plaintiffs NAZ, LLC ("NAZ") and Advanced Neurodiagnostic Center, Inc. ("Ad Neuro") (collectively "Plaintiffs") respond in opposition;[2] several motions *in limine* to exclude Plaintiffs' experts filed by Philips,[3] to which Plaintiffs respond in opposition,[4] and in support of which Philips replies;[5] Plaintiffs' motion to strike Philips' reply memoranda in support of its motions to strike Plaintiffs' experts;[6] several motions *in limine* to exclude Philips' experts filed by Plaintiffs,[7] to which Philips responds in opposition;[8] and Philips' motion *in limine* to exclude evidence regarding subsequent remedial measures,[9] to which Plaintiffs respond in opposition,[10] and in support of

---

[1] R. Docs. 230, 243 & 245.
[2] R. Docs. 271, 287 & 289.
[3] R. Docs. 231, 233-236, 239 & 286.
[4] R. Docs. 272, 279, 280, 282 & 283.
[5] R. Docs. 302, 304, 306, 308, 310. Plaintiffs filed a motion to strike Philips' reply memoranda arguing that they unnecessarily added to the voluminous documents in this case (R. Doc. 299). Plaintiffs' motion is DENIED, and the Court will consider Philips' reply memoranda.
[6] R. Doc. 299.
[7] R. Docs. 261-265.
[8] R. Docs. 274-278.
[9] R. Doc. 238.
[10] R. Doc. 281.

which Philips replies.[11]  Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.    BACKGROUND

This litigation arises from a medical facility's purchase of allegedly faulty MRI equipment,[12] the manufacturer's allegedly faulty installation and service of the MRI equipment, as well as its failure to provide the purchaser with the "complete package," including the hardware and software components that should have been delivered when the MRI equipment was installed. The Court has summarized the factual background of this matter in a previous Order & Reasons and will not repeat the full summary herein.[13]

## II.    LAW & ANALYSIS

### A.    Philips' Motions for Summary Judgment

#### 1.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.*  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *Id.* at 323.  If the moving party meets

---

[11] R. Doc. 320.
[12] MRI, or magnetic resonance imaging, is non-invasive imaging technology that, using a large magnet and radio waves, produces three-dimensional detailed anatomical images or organs and structures inside the body.
[13] R. Doc. 220.

that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some

metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### 2. Philips' Motion for Summary Judgment Regarding the Consequential Damages Waiver (R. Doc. 230)

Philips moves for summary judgment on Plaintiffs' consequential damages claim arguing that Plaintiffs waived such a claim in executing Revision 10 or Revision 12 of the alleged contract and agreeing to Philips' standard "Terms and Conditions of Sale," which includes clauses that state:

> 12. Limitation of Liability. THE TOTAL LIABILITY, IF ANY, OF PHILIPS AND ITS AFFILIATES FOR ALL DAMAGES AND BASED ON ALL CLAIMS, WHETHER ARISING FORM BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHER TORT, OR OTHERWISE, ARISING FROM A PRODUCT, LICENSED SOFTWARE, AND/OR SERVICE IS LIMITED TO THE PRICE PAID HEREUNDER FOR THE PRODUCT, LICENSED SOFTWARE, OR SERVICE.
>
> THIS LIMITATION SHALL NOT APPLY TO:
>
> (a)    THIRD PARTY CLAIMS FOR BODILY INJURY OR DEATH CAUSED BY PHILIPS' NEGLIGENCE OR PROVEN PRODUCT DEFECT;
>
> (b)    CLAIMS OF TANGIBLE PROPERTY DAMAGE REPRESENTING THE ACTUAL COST TO REPAIR OR REPLACE PHYSICAL PROPERTY DAMAGE;
>
> (c)    OUT OF POCKET COSTS INCURRED BY CUSTOMER TO PROVIDE PATIENT NOTIFICATIONS, REQUIRED BY LAW, TO THE EXTENT SUCH NOTICES ARE CAUSED BY PHILIPS UNAUTHORIZED DISCLOSURE OF PHI; AND
>
> (d)    FINES/PENALTIES LEVIED AGAINST CUSTOMER BY GOVERNMENT AGENCIES CITING PHILIPS UNAUTHORIZED

4

DISCLOSURE OF PHI AS THE BASIS OF THE FINE/PENALTY SUCH FINES OR PENALTIES SHALL CONSTITUTE DIRECT DAMAGES.

13. DISCLAIMER. IN NO EVENT SHAL PHILIPS OR ITS AFFILIATES BE LIABLE FOR ANY INDIRECT PUNITIVE, INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST REVENUES OR PROFITS, BUSINESS INTERRUPTION, LOSS OF DATA, OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES WHETHER ARISING FROM BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, INDEMNITY, STRICT LIABILITY OR OTHER TORT.[14]

The parties previously made arguments regarding whether Plaintiffs agreed to Philips' standard "Terms and Conditions of Sale" in connection with Philips' motion to strike Plaintiffs' jury demand.[15] In ruling on that motion, this Court found that "there are disputed issues of material fact regarding whether the parties entered into a written contract that incorporates Philips' standard 'Terms and Conditions of Sale.'"[16] Thus, the Court ruled that trial of this matter will proceed in two phases where the jury will decide whether the parties entered into a contract and, if so, what the terms of that contract are.[17] If the jury finds that there is no contract that incorporates Philips' standard "Terms and Conditions of Sale," the matter will proceed as a jury trial.[18] On the other hand, if the jury finds that there is a contract that incorporates Philips' standard "Terms and Conditions of Sale," the Court will determine if Plaintiffs knowingly and voluntarily waived the jury; and if they did, the remainder of the issues will be tried as a bench trial.[19] If the jury finds that Philips' standard "Terms and Conditions of Sale" were not incorporated into a binding written contract, or the Court finds that Plaintiffs' jury waiver was not made knowingly and voluntarily, then the remainder of the issues will be tried by the jury.[20]

---

[14] R. Docs. 230-3 at 41 & 230-5 at 39. The language quoted above is included in Philips' standard "Terms and Conditions of Sale" attached to Revision 12 (R. Doc. 230-5). The version of clause 12 regarding limitation of liability that is in Philips' standard "Terms and Conditions of Sale" attached to Revision 10 does not include subsections b through d.
[15] R. Docs. 141, 187 & 191.
[16] R. Doc. 220 at 22.
[17] Id.
[18] Id.
[19] Id.
[20] Id. at 22-23.

The same reasoning applies to the motion before the Court regarding the contractual clauses waiving Plaintiffs' right to seek consequential damages. There are disputed issues of material fact that preclude summary judgment on the issue of whether the parties entered into a contract incorporating Philips' standard "Terms and Conditions of Sale." Therefore, Philips' motion for summary judgment on consequential damages is DENIED WITHOUT PREJUDICE to Philips re-urging the motion if the jury finds that there is a contract incorporating Philips' standard "Terms and Conditions of Sale."

### 3. Philips' Motion for Summary Judgment to Dismiss Plaintiffs' Claims Regarding the Installation of the MRI on the Third Floor (R. Doc. 243)

Philips moves for summary judgment on Plaintiffs' damages claims related to locating the MRI on the third floor – instead of the second floor – arguing that Plaintiffs were solely responsible for the design of the building, and thus have no basis for a claim for negligence or gross negligence against Philips with respect to delays and expenses caused by the location of the MRI equipment.[21] Philips argues that it simply advised that design changes were required to prevent interference with the equipment caused by the cars in the parking lot below the second floor, and it was Plaintiffs' choice to follow that advice and install the MRI equipment on the third floor.[22] Philips also argues that Plaintiffs have no claim for breach of contract with respect to the installation location because there was no installation or service agreement.[23] Further, Philips argues that disclaimers included in the site preparation documents and Philips' standard "Terms and Conditions" absolve it from any responsibility related to the location of the MRI equipment.[24]

As explained by Plaintiffs in their opposition memorandum, there are genuine issues of material fact that preclude summary judgment on Plaintiffs' claims related to the third-floor installation of the MRI equipment. The facts surrounding the installation of the MRI equipment

---

[21] R. Doc. 243-1 at 5-9.
[22] *Id.* at 3.
[23] *Id.* at 12-14.
[24] *Id.* at 14-19.

and the duties allegedly assumed by Philips are highly contested issues. Further, as explained above, there are genuine issues of material fact regarding whether the parties entered into any contracts and what the terms of those contracts are. Therefore, Philips' motion for summary judgment on the third-floor installation issue is DENIED.

### 4. Philips' Motion for Summary Judgment on Claims Regrading 5 Gauss Line and Surgery Suite (R. Doc. 245)

Philips moves for summary judgment on Plaintiffs' claims for damage related to the loss of the opportunity to have an ambulatory surgery center at the facility.[25] Philips argues that Raymond Bergeron, Plaintiffs' architect, testified that he did not design the facility to include an ambulatory surgery center.[26] Philips also argues that Plaintiffs were informed by their own expert in medical physics and MRI safety, Tianliang Gu, PhD, that the problem of the 5 gauss line extending into the next room could have been solved by blocking off the affected area with a piece of furniture.[27] Finally, Philips argues that the disclaimers on its drawings preclude liability for the placement of the 5 gauss line.[28]

Plaintiffs argue that there are genuine issues of material fact that preclude summary judgment on their claims related to the 5 gauss line.[29] Plaintiffs argue that they had planned to put the MRI equipment on the second floor so that an ambulatory surgery center could eventually be constructed on the third floor, and Philips' insistence that the MRI equipment go on the third floor foiled these plans.[30] Plaintiffs also argue that blocking the 5 gauss line with a piece of furniture to utilize the space as an ambulatory surgery center was not a viable option, and that the disclaimer is unenforceable because it was not explained to Plaintiffs.[31]

---

[25] R. Doc. 245.
[26] R. Doc. 245-1 at 7-8.
[27] *Id.* at 5-7.
[28] *Id.* at 6-7.
[29] R. Doc. 289.
[30] *Id.* at 4-5.
[31] *Id.* at 3-4.

Just like Plaintiffs' claims related to the third-floor installation, there are genuine issues of material fact that preclude summary judgment on Plaintiffs' claims related to the 5 gauss line. The facts surrounding the installation of the MRI equipment are highly contested issues. Further, as explained above, there are genuine issues of material fact regarding whether the parties entered into any contracts and what the terms of those contracts are, including any disclaimers. Therefore, Philips' motion for summary judgment on the 5 gauss line issue is DENIED.

### B. Philips' and Plaintiffs' *Daubert* Motions

#### 1. *Daubert* Standard

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 of the Federal Rules of Evidence provides:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability:

(1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Because the fact-finder is "the proper arbiter of disputes between conflicting opinions," generally "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility" and should be left for the [fact-finder's] consideration." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation omitted). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 508 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed at an issue that is "well within the common sense understanding of jurors or requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit

witness testimony, or "otherwise make factual determinations reserved for the trier of fact." *Highland Capital Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002). A witness qualified as an expert is not strictly confined to his area or practice but may testify regarding related applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 2018 WL 4932716, at *3 (5th Cir. Oct. 10, 2018) (quotations and citations omitted).

### 2. Philips' Motion to Strike Tianliang Gu (R. Doc. 231)

Philips seeks to exclude the testimony of Plaintiffs' purported expert in medical physics and MRI safety, Tianliang Gu, PhD. ("Gu").[32] Philips argues that Gu's opinions are unreliable because his statements regarding the slow movement of the magnet, the propriety of the quenching, Philips' alleged failure to inspect the vent after quenching, the site planning, and the 5 gauss line are not supported by data, verifiable calculations, or peer-reviewed studies.[33] Philips also contends that Plaintiffs, per the American College of Radiology Guidance, were responsible for inspecting the vent after the quench, not Philips.[34] Further, Philips contends that Gu's report makes a legal conclusion by suggesting that Philips had a duty to suggest to Plaintiffs options for installing the MRI equipment on the second floor.[35]

---

[32] R. Doc. 231.
[33] R. Doc. 231-1 at 7-15.
[34] *Id.* at 9-10.
[35] *Id.* at 11-12.

Plaintiffs argue that Gu is qualified to testify as an expert in physics and MRI safety.[36] Gu earned a Master of Science in Theoretical Physics in 1999 and a Ph.D. in Medical Physics in 2004.[37] He is Board Certified by the American Board of Radiology and is a diagnostic imaging physicist and MRI safety officer for Ochsner Medical Center.[38] Gu has spoken at several conferences and contributed to numerous scientific papers.[39] He has worked with MRI manufacturers and engineers and is responsible for approving site plans for MRI facilities.[40] Plaintiffs contend that Gu's opinions are relevant and reliable as they are supported by his vast knowledge and experience in the field of physics and his observations in this case.[41]

Gu's education and experience as a medical physicist qualify him to testify as an expert in the field of medical physics and MRI safety. His opinions regarding the slow movement of the magnet, the propriety of the quenching, Philips' alleged failure to inspect the vent after quenching, the site planning, and the 5 gauss line are relevant and reliable because they are based on his experience as applied to his observations in this case. To the extent Philips questions the content of and support for Gu's report, and his lack of independent calculations, Philips will have an opportunity to explore these issues through cross-examination of Gu and the presentation of countervailing testimony. As such, Philips' motion to exclude Gu is DENIED.

### 3. Philips' Motion to Strike Thomas Read (R. Doc. 233)

Philips seeks to exclude the testimony of Plaintiffs' purported expert in engineering and material science, Thomas Read, PhD, P.E. ("Read").[42] Philips argues that, while Read certainly has expertise in some areas of engineering and materials science, he is not qualified to testify as an expert in this case because he lacks education and experience in MRI sales, design of MRI

---

[36] R. Doc. 282 at 2-3.
[37] R. Doc. 282-1 at 1.
[38] *Id.*
[39] *Id.* at 1-2.
[40] R. Doc. 282-2 at 27,
[41] R. Doc. 282 at 3-4.
[42] R. Doc. 233.

suites, and installation and function of MRI equipment.[43]  Philips also argues that Read's opinions are not reliable because his report is disorganized and his opinions are not supported by published studies or scientific techniques.[44]  Rather, one opinion is supported by referencing Wikipedia.[45]  Philips argues that Read's unsupported opinions would confuse the trier of fact and should be excluded.[46]

Plaintiffs argue that Read's testimony is admissible because he is qualified to testify as an expert materials scientist and offers relevant, reliable opinions in this case.[47]  In 1965, Read earned a Bachelor of Science in Metallurgical Engineering from the University of Pennsylvania.[48]  He earned a Master of Science in Materials Science and a Ph.D. in Materials Science and Engineering in 1967 and 1972, respectively, from Stanford University.[49]  Read is a Registered Professional Manufacturing Engineer in California, with forty years of experience as a manufacturing engineer and over fifty years of experience performing materials failure analysis.[50]  Plaintiffs argue that Read's opinions are about the failures of the materials of the foot pads and quench-pipe caulking, and that his education and experience render him qualified to give such opinions.[51]

Read's education and experience as a materials scientist qualify him to testify as an expert in the field of materials science.  His opinions regarding the alleged materials failures with respect to the footpads and quench-pipe caulking are relevant and reliable.  To the extent Philips questions the content of Read's report, and his limitations in the areas of MRI safety, design, and operation, Philips will have an opportunity to explore these issues through cross-examination of Read and

[43] R. Doc. 233-1 at 8.
[44] *Id.* at 11.
[45] *Id.*
[46] *Id.* at 13-14.
[47] R. Doc. 279.
[48] R. Doc. 279-1 at 1.
[49] *Id.*
[50] *Id.*
[51] R. Doc. 279 at 3-4.

the presentation of countervailing testimony. As such, Philips' motion to exclude Read is DENIED.

### 4. Philips' Motion to Strike William Dixon (R. Doc. 234)

Philips seeks to exclude the testimony of Plaintiffs' purported expert in the installation and repair of MRI equipment, William Dixon ("Dixon").[52] Philips argues that Dixon is not qualified to render expert opinions concerning the MRI equipment suite located in Plaintiffs' facility because he does not have sufficient education and experience.[53] Dixon has an electrical engineering degree from DeVry, which included only two physics classes and no education on mechanical engineering or materials science.[54] His training on MRI equipment consists of on-the-job training when he was employed by equipment manufacturers.[55] Dixon does not have any experience designing MRI suites.[56] Philips also argues that Dixon's opinions are unreliable because they lack analytical reasoning, pertinent calculations, and peer-reviewed methodology.[57] Philips argues that Dixon's report is confusing because it is vague and disorganized.[58] Further, Philips argues that Dixon's report contains an inadmissible legal conclusions when he states that Philips acted "indirectly" as a turnkey provider and that "it is blatantly clear that there exists multiple occurrences of negligence."[59] Finally, Philips argues that Dixon's opinions conflict with opinions given by Plaintiffs' purported expert in Food and Drug Administration ("FDA") regulations, Donald Marks, regarding whether the alleged movement of the MRI equipment was a hazard.[60]

---

[52] R. Doc. 234.
[53] R. Doc. 234-1 at 7
[54] R. Doc. 234-8 at 21.
[55] *Id.* at 6.
[56] *Id.* at 32.
[57] R. Doc. 234-1 at 9-14.
[58] *Id.* at 14.
[59] *Id.* at 17.
[60] *Id.* at 18. The Court will not address this issue because it grants Philips' motion to strike Marks.

Plaintiffs argue that Dixon is qualified to testify as an expert in the installation and servicing of MRI equipment based on his electrical engineering degree and 18 years of experience as a service engineer of MRI equipment.[61]  Dixon is the owner of an MRI service company and performs repairs, installations, de-installations, and inspections of MRI equipment worldwide.[62] He has placed MRI equipment using the manufacturer's specifications, performed measurements regarding the placement of the MRI's isocenter, followed the manufacturer's siting plan regarding where to place the magnet with respect to the magnetic steel shielding, and performed calculations and informed the manufacturer where to place the MRI equipment at the minimum distance.[63] Further, Dixon has experience installing Philips' MRIs, including the model at issue in this case.[64] Finally, he has been involved in the quenching of MRI equipment and has experience measuring the 5 gauss line.[65]  Plaintiffs contend that Dixon's opinions based on his experience are relevant and better explained in his deposition testimony than in his report.[66]

Dixon's experience installing and repairing MRI equipment qualify him to testify as to such activities.   His opinions regarding the slow movement of the magnet, the propriety of the actions of Philips' employees, and general issues involving the installation and servicing of the MRI equipment are relevant and reliable because they are based on his experience as applied to his observations in this case.  To the extent Philips questions the content of Dixon's report, and his lack of independent calculations and formal education in certain sciences, Philips will have an opportunity to explore these issues through cross-examination of Dixon and the presentation of countervailing testimony.   However, Dixon's statement that there was negligence is an inadmissible legal conclusion.  On the other hand, his opinions about what services Philips should

---

[61] R. Doc. 283 at 1.
[62] R. Doc. 283-1 at 1.
[63] *Id.* at 7-8.
[64] *Id.* at 9.
[65] R. Doc. 283 at 4 & R. Doc. 283-1 at 4.
[66] R. Doc. 283 at 6-8.

have performed do not constitute legal conclusions. As such, Philips' motion to exclude Dixon is GRANTED as to the legal conclusion that Philips was negligent, and otherwise DENIED.

### 5. Philips' Motion to Strike Donald Marks (R. Doc. 235)

Philips seeks to exclude the testimony of Plaintiffs' purported expert in FDA regulations, Donald Marks ("Marks").[67] Philips argues that Marks does not have any education or experience regarding MRI equipment and his opinions constitute impermissible legal conclusions.[68] Philips argues that Marks, as a medical doctor who was previously involved in the pharmaceutical industry, is not an expert in the FDA regulations pertaining to the installation of MRI equipment.[69] Marks does not quote the FDA regulations upon which he relies to show how they are applicable, and he makes impermissible legal conclusions that Philips violated the law by allegedly failing to comply with those regulations.[70] Philips also argues that Marks' ultimate conclusion, as follows, is an inadmissible "bundle of legal conclusions:"

> It is thus my opinion that Philips cannot limit its obligations to insure that the system only meet Philips['] "performance specifications"; but it is also obligated to insure that the MRI system meets **all** specifications to insure the proper and safe operation of the MRI system; and that would include ensuring that the location and positioning of the MRI magnet would not ultimately create a hazard.[71]

Finally, Philips argues that Marks' opinion that the movement of the MRI equipment created a hazard will confuse the jury because that opinion contradicts an opinion rendered by another Plaintiffs' expert.[72]

Plaintiffs argue that Marks is qualified to testify as an expert in FDA regulations because he has experience in filing applications with the FDA regarding drugs and medical equipment, including MRI components, and worked in the regulatory affairs departments of companies at

---

[67] R. Doc. 235.
[68] R. Doc. 235-1 at 1.
[69] *Id.* at 8-9.
[70] *Id.* at 10-12.
[71] *Id.* at 12 (citing R. Doc. 235-9 at 4) (emphasis in original).
[72] *Id.* at 14.

which he was employed.[73]  Plaintiffs argue that it is immaterial that Marks does not have specific experience with FDA regulations pertaining to MRI manufacturers because his experience in studying FDA regulations allows him to evaluate the ones applicable to Philips.[74]  Plaintiffs contend that Marks will explain the purpose of FDA regulations and "Marks' opinion is, in essence, assisting the jury by explaining that FDA regulations must be followed by Philips."[75]  Further, Plaintiffs argue that Marks "will explain that Philips cannot absolve itself from responsibility by words in a site plan drawing or create sole responsibility on Plaintiffs because FDA regulations designed to place responsibility of safety on manufacturers must be complied with and not circumvented."[76]  Finally, Plaintiffs argue that Marks' testimony does not conflict with that of another Plaintiffs' expert.[77]

Marks does not have specific experience with FDA regulations pertinent to the installation of MRI equipment.  His experience with MRI equipment is limited to using MRI images for a few articles he wrote that have nothing to do with the design or installation of MRI equipment.[78]  At his deposition, Marks testified that he is not an expert in the requirements for MRI installation.[79]  Marks also incorrectly testified that MRI equipment emits x-rays and requires a certain FDA form.[80]  Further, Marks offers opinions regarding FDA regulations for reporting incidents after they occur, which opinions are irrelevant to the issues in this case.[81]  Marks also incorrectly testified that Philips did not obtain pre-market approval from the FDA for the MRI equipment at issue.[82]  Finally, Marks' report offers impermissible legal conclusions regarding Philips' ability to

---

[73] R. Doc. 280 at 3.
[74] *Id.* at 5-6.
[75] *Id.* at 3-4.
[76] *Id.* at 7.
[77] *Id.*
[78] R. Doc. 310-2 at 4.
[79] *Id.* at 15.
[80] R. Doc. 310 at 5.
[81] *Id.* at 6-7.
[82] *Id.* at 7-8

contract out of legal obligations.  To the extent FDA regulations are applicable to the issues in this case, the Court will either issue an appropriate jury instruction or consider them in formulating its Findings of Fact and Conclusions of Law.  Because Marks is not qualified to offer opinions regarding FDA regulations applicable to MRI installation, offers inapplicable or potentially inaccurate testimony, and offers inadmissible legal conclusions, Philips' motion to exclude Marks is GRANTED.

### 6.  Philips' Motion to Strike John Theriot (R. Doc. 236)

Philips seeks to exclude the testimony of Plaintiffs' purported expert certified public accountant ("CPA"), John Theriot ("Theriot").[83]  Philips does not dispute that Theriot, who is an accountant with significant experience in business valuation and litigation, is qualified to render expert opinions in the field of accounting and lost profits.[84]  Philips argues that Theriot's opinions are not based on market data or data from other facilities owned by Plaintiffs, and provide no verifiable calculations.[85]  Philips also argues that Theriot's calculations regarding lost profits from an ambulatory surgery center are irrelevant because the architect who designed the building made a sworn statement that no such facility was included in the building plans.[86]  Philips contends that Theriot's opinions should be excluded because he does not show that the figures upon which he relied are accurate or relevant and does not account for future business trends.[87]

Plaintiffs argue that Theriot's opinions are relevant and reliable.  Theriot has a Bachelor of Science in Accounting from Nicholls State University and a Master of Science in Accounting from Tulane University.[88]  He is the managing partner of the public accounting firm Malcolm M. Dienes, LLC, and has over thirty years of experience in public accounting.[89]  He is a CPA, certified forensic

---

[83] R. Doc. 236.
[84] R. Docs. 236-2 & 236-6 at 16-34.
[85] R. Doc. 236-2 at 8.
[86] *Id.* at 9.
[87] *Id.* at 11.
[88] R. Doc. 272-2 at 1.
[89] *Id.*

accountant, and certified in financial forensics, with extensive litigation experience, having provided testimony in more than 200 cases.[90] Plaintiffs argue that Theriot used an accepted method of calculating lost profits by determining the number of MRI scans that would have occurred each day based on evidence in the case and the amount of revenue earned from each using information provided by a life-care planner, and then creating a lost-profits model.[91] Theriot used the ambulatory surgery center's profits as the baseline for his calculations.[92] Thus, Plaintiffs contend that Theriot should be permitted to testify.

Theriot is qualified to testify as an expert in the field of accounting and lost profits. He offers relevant and reliable opinions regarding Plaintiffs' lost profits. To the extent Philips question the content of Theriot's report, including his alleged faulty assumptions and lack of independent research and analysis, and his calculations, Philips will have an opportunity to explore these issues through cross-examination of Theriot and the presentation of Plaintiffs' retained expert CPA and other countervailing testimony. As such, Philips' motion to exclude Theriot is DENIED.

### 7. Plaintiffs' Motion to Strike Jeff Englert (R. Doc. 261)

Plaintiffs seek to exclude the testimony of Philips' purported expert CPA, Jeff Englert ("Englert").[93] Plaintiffs argue that Englert is not qualified to testify as an expert in the lost profits analysis of a healthcare facility because he does not have "sufficient training, experience or knowledge" to perform, and has never performed, a lost-profits analysis pertaining to a healthcare facility.[94] Plaintiffs contend that Englert's experience as a CPA working on insurance claims and

---

[90] *Id.*
[91] R. Doc. 272 at 4-5.
[92] *Id.* at 6.
[93] R. Doc. 261.
[94] R. Doc. 261-1 at 6.

audits of settlements in a multi-district litigation case in federal court is insufficient to qualify him to testify as an expert accountant in this matter.[95]

Plaintiffs argue that Englert's opinions are not reliable or relevant because "they are not supported by any verifiable research, data, calculations, and/or analysis, and are based on speculative theories and insufficient, one-sided facts and assumptions."[96] Plaintiffs contend that Englert's opinions must be excluded because he did not perform an independent analysis of Plaintiffs' lost profits, but instead offers a critique of the report authored by Theriot.[97] Specifically, Plaintiffs contend that Englert concludes that Theriot's loss period is unsupported, but Plaintiffs contend that Englert "simply ignores Plaintiffs' claims of issues which delayed the original installation of the MRI, and continued issues with the MRI which has prevented the facility from ever operating at full capacity, prevented Plaintiffs from hiring other physicians, and prevented Plaintiffs from taking the necessary steps to finish the surgery rooms for the ambulatory surgery center."[98] Plaintiffs cite specific examples of lost profits and physician retention that they claim Englert ignored.[99]

Further, Plaintiffs argue that Englert's report does not include market data or an independent market analysis.[100] Englert opines that some of the patients who would have used the MRI at issue used another one owned by Plaintiffs, thus resulting in no lost profits.[101] Plaintiffs contend that this opinion is faulty because Englert failed to account for the differences in the MRI machines and that the other one was taken out of service.[102] Plaintiffs again argue that Englert's report in this respect is not useful to the jury because it is simply a critique of Theriot.[103]

---

[95] *Id.* at 6-7.
[96] *Id.* at 8.
[97] *Id.*
[98] *Id.* at 8-9.
[99] *Id.* at 9.
[100] *Id.* at 9-10.
[101] *Id.* at 9.
[102] *Id.* at 9-10.
[103] *Id.* at 10.

Philips argues that Englert is qualified to testify as an expert CPA and his "opinions are based on a reliable review of records and a sound methodology that is generally accepted in his field."[104]  Englert is a vice president in the Forensic Accounting and Claims Services Practice of Marsh Risk Consulting ("Marsh").[105]  He is a CPA and a certified fraud examiner ("CFE"), having earned a Bachelor of Science in Accounting from Louisiana State University and a Master of Science in Accounting from the University of Texas at Austin.[106]  From 2008 to 2014, Englert was a manager at Ernst & Young LLP, and from 2014 to 2017 he was the director of audit for the BP settlement program.[107]  Englert has been employed at Marsh since 2017 where his practice "focuses on providing forensic accounting services in the measurement of complex insurance claims" in a variety of industries.[108]  He also has experience in "performing forensic and investigative accounting work utilizing electronic evidence discovery and data mining."[109]

Philips argues that any issues Plaintiffs have with the research, data, calculations, analysis, theories, and facts underlying Englert's opinions can be developed at trial through rigorous cross-examination and the presentation of contrary opinions and evidence.[110]  Philips also argues that Englert's opinions are largely an evaluation of Theriot's opinions because Theriot's calculations that Plaintiffs lost $34,000,000 in profits "represent in large part what is at issue in this case," and Theriot based that opinion on assumptions Plaintiffs asked him to make, rather than on market research and independent analysis.[111]  Philips contends that Englert's testimony will assist the fact-finder to understand the various figures at issue in this case.[112]

---

[104] R. Doc. 278 at 1.

[105] R. Doc. 278-1.

[106] *Id.*

[107] *Id.*  The BP settlement program was created to administer the disbursement of billions of dollars in damages for civil claims arising from MDL No. 2179 *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010.*

[108] *Id.*

[109] *Id.*

[110] R. Doc. 278 at 2-3.

[111] *Id.* at 3.

[112] *Id.* at 6.

Although Englert has not testified in the last four years, and his CV does not specifically identify any experience in evaluating the lost profits of a healthcare facility in particular,[113] his education and general experience as a CPA and CFE qualify him to testify as an expert in the field of accounting and provide him with the tools needed to evaluate any business's lost profits. To the extent Plaintiffs question the content of Englert's report, including his alleged faulty assumptions and lack of independent research and analysis, Plaintiffs will have an opportunity to explore these issues through cross-examination of Englert and the presentation of Plaintiffs' retained expert CPA and other countervailing testimony. As such, Plaintiffs' motion to exclude Englert is DENIED.

### 8. Plaintiffs' Motion to Strike Allen Ohlmeyer (R. Doc. 262)

Plaintiffs seek to exclude the testimony of Philips' purported expert healthcare architect, Allen Ohlmeyer ("Ohlmeyer").[114] Plaintiffs do not challenge Ohlmeyer's qualifications as an architect.[115] Rather, they argue that Ohlmeyer's opinions are not relevant and will not assist the trier of fact in this case.[116] Plaintiffs argue that Ohlmeyer's report consists of a recitation of the documents he reviewed without any opinions, and that the opinions he offers regarding the responsibilities of the owner are not based on facts.[117] Further, Plaintiffs argue that an expert opinion is not needed to identify the proper use of the building.[118] Plaintiffs also argue that Ohlmeyer offers impermissible legal conclusions regarding the responsibilities of people involved in the construction of the facility.[119] Specially, Plaintiffs contend that the following statements constitute impermissible legal conclusions:

---

[113] R. Doc. 278-1.
[114] R. Doc. 262.
[115] R. Doc. 262-1.
[116] *Id.* at 6-7.
[117] *Id.* at 6.
[118] *Id.*
[119] *Id.* at 7.

1. The quench resulted in the failure of the seal between the helium exhaust pipe and the metal roof … The Owner assumed responsibility for the system's design and performance when he failed to ensure that the system was installed in accordance with [the] plans.

2. The two ORs observed would be well beyond the three-patient limit and would not be allowed within Business Occupancy.

3. Of the documents [Ohlmeyer] reviewed there were none that indicated the Owner hired a design professional to coordinate the magnet installation, nor were there any that indicated the Owner purchased the magnet as a turn-key package from Philips. Consequently, it became the Owner's responsibility to coordinate the equipment and all of its site preparation requirements, including magnetic and RF shielding …

4. Without [Raymond C. Bergeron, Jr. Architects'] or a General Contractor's participation in coordinating shielding documents it would have become the Owner's responsibility to ensure the shielding requirements were met. Philips notes in its Final Site Preparation Support Document that it is the Owner's responsibility for the preparation of the site. Thus, the responsibility for coordinating the contents of the Lee & Associations drawings would have been the Owner's, either directly or through his Architect or General Contractor.

5. Because [Raymond C. Bergeron, Jr. Architects] only prepared the Architectural drawings for the Tenant Buildings it would have become the Owner's responsibility to coordinate the work of engineers.[120]

Philips argues that Ohlmeyer should be permitted to testify as an expert healthcare architect based on his extensive education and experience, which he applied to render his opinions in this case.[121] Ohlmeyer obtained a Bachelor of Architecture from Louisiana State University in 1991.[122] For the last 24 years, Ohlmeyer has specialized in the planning and design of healthcare facilities, including ones that house MRI equipment.[123] Since 2005, he has been the director of healthcare design at Sizeler Thompson Brown Architects, where he oversees all of the firm's healthcare projects.[124] Ohlmeyer is board certified as a healthcare architect by, and a member of, the

---

[120] R. Doc. 262-1 at 7-9 (citing R. Doc. 262-2 at 4-8).
[121] R. Doc. 277 at 1.
[122] R. Doc. 277-1 at 1.
[123] *Id.* at 1-3.
[124] *Id.*

American College of Healthcare Architects, and is also a member of the American Society for Healthcare Engineering of the American Hospital Association.[125]

Philips also argues that Ohlmeyer's opinions as an expert in healthcare architecture are relevant to the issues of this case because they will aid the trier of fact in evaluating the construction of the MRI facility in light of the industry regulations, standards, and practices, which evaluation is outside the life experiences of an average layperson.[126] Philips further argues that Ohlmeyer's recitation of the documents he reviewed is a description of his methodology in which he applied his experience to identify important issues concerning the construction and to explain their importance.[127] Finally, Philips argues that Ohlmeyer's opinions regarding the parties' respective responsibilities in the construction process are not legal conclusions, but rather opinions regarding industry practice.[128]

Ohlmeyer's education and experience qualify him to testify as an expert in the field of healthcare architecture. Ohlmeyer's report demonstrates that his opinions in this case are relevant to the issues regarding the construction of the MRI suite and cause of Plaintiffs' alleged damages. Further, Ohlmeyer's report offers opinions on industry standards and practices, not impermissible legal conclusions. To the extent Plaintiffs question the content of Ohlmeyer's report, Plaintiffs will have an opportunity to explore these issues through cross-examination of Ohlmeyer and the presentation of countervailing testimony. As such, Plaintiffs' motion to exclude Ohlmeyer is DENIED.

### 9. Plaintiffs' Motion to Strike Tobias Gilk (R. Doc. 263)

Plaintiffs seek to exclude the testimony of Philips' purported expert in the field of MRI safety, siting, installation, and operation, Tobias Gilk ("Glick").[129] Plaintiffs argue that Glick is

---

[125] *Id.* at 1.
[126] R. Doc. 277 at 3.
[127] *Id.* at 4.
[128] *Id.* at 5-7.
[129] R. Doc. 263.

not qualified to testify as an expert in those fields because: he is an architect who has worked as a subcontractor on projects where the MRI was installed by other contractors; he has no engineering qualifications; he has no experience in designing helium quench vent piping; he has not been a general contractor on an MRI installation project; he has no experience with the RF shielding configuration, including the calculation of magnetic forces and thickness of the steel; he has not been employed by an MRI manufacturer; and he has never been involved in a forced quench of an MRI machine.[130]

Plaintiffs also argue that Gilk's opinions are not reliable because they are not based on engineering methodology or objective analysis, calculations, and data.[131] Plaintiffs argue that Gilk's lack of expertise in engineering renders unreliable his opinions regarding: moving the MRI equipment from the second floor to the third; whether Philips was not required to provide professional design and construction coordination services to Plaintiffs; rebuttal of Gu's opinions regarding the cause of the movement of the MRI equipment; whether the footpads supporting the MRI were not properly tested; the propriety of the quench process; and the proper design of the helium quench pipe.[132] Plaintiffs also argue that Gilk's simulation of the quench process is not admissible because of differences between his simulation and what actually occurred.[133] Further, Plaintiff's argue that Gilk offers impermissible legal conclusions by stating that Philips had no duty to provide design and construction services or to inspect the pipes after the quench process.[134] Finally, Plaintiffs argue that Gilk's opinions are not based on sufficient information because he did not consider the particular circumstances involved in this case regarding Philips' involvement in the building of the facility.[135]

---

[130] R. Doc. 263-1 at 4-6.
[131] *Id.* at 7.
[132] *Id.* at 8-12, 13-
[133] *Id.* at 12-13.
[134] *Id.* at 14-15.
[135] *Id.* at 15-17.

Philips argues that Gilk's experience qualifies him to testify as an expert in the field of MRI safety, siting, installation, and operation.[136] Gilk is an architect who is MR safety certified by the American Board of Magnetic Resonance Safety.[137] He has designed or consulted on the installations of hundreds of MRI machines, including those manufactured by Philips.[138] Gilk has authored or contributed to more than seventy studies in his field of expertise.[139] Philips contends that Gilk's opinions do not require engineering experience, as argued by Plaintiffs, but rather are based on his actual experience in working with MRI installation projects.[140] Further, Philips argues that Gilk's opinions are rendered from his perspective as an architect, MRI safety expert, and one of the authors of the American College of Radiology guidelines upon which Gu relies to render his opinions.[141] In sum, Philips argues that Plaintiffs' issues with the contents of Gilk's report should be handled through cross-examination, not exclusion of Gilk's testimony.[142]

Gilk's experience qualifies him to testify as an expert in the field MRI safety, siting, installation, and operation. Further, Gilk's report demonstrates that his opinions in this case are relevant to the issues regarding the construction of the MRI suite, quenching process, and cause of Plaintiffs' alleged damages. To the extent Plaintiffs question the content of Gilk's report, Plaintiffs will have an opportunity to explore these issues through cross-examination of Gilk and the presentation of Plaintiffs' retained expert in a similar field. As such, Plaintiffs' motion to exclude Gilk is DENIED.

---

[136] R. Doc. 276 at 2.
[137] R. Doc. 276-3 at 5.
[138] *Id.* at 3-4.
[139] R. Doc. 276-5 at 1-3.
[140] R. Doc. 276 at 3.
[141] *Id.* at 4 & 10-11.
[142] *Id.* at 14-15.

### 10. Plaintiffs' Motion to Strike Richard Rathe (R. Doc. 264)

Plaintiffs seek to exclude the testimony of Philips' purported expert general contractor Richard Rathe ("Rathe").[143]  Plaintiffs do not challenge Rathe's experience or qualifications to testify in the fields of general contracting, project management, and construction of MRI suites.[144] Instead, Plaintiffs argue that Rathe's report contains opinions regarding construction details, issues, and code violations that are not pertinent to the issues in this case, and other statements that are "comments" rather than opinions.[145]

Citing Rathe's CV, Philips argues that "Rathe is the only expert in this case with experience and expertise" in matters concerning the construction of facilities that house MRI machines and his testimony should be admitted.[146]  Rathe has a Bachelor of Science in Civil Engineering from Vanderbilt University and has worked in the engineering and construction field since 1976.[147]  For the last 30 years, Rathe has focused on construction projects in medical facilities including work on MRI facilities.[148]  Philips further argues that Rathe's opinions regarding the defects in the construction of the MRI facility, and the origin of those defects, address central issues in the case.[149]

Rathe's education and experience qualify him to testify as an expert in the fields of general contracting, project management, and construction of MRI suites.  Further, Rathe's report demonstrates that his opinions in this case are relevant to the issues regarding the construction of the MRI suite and the cause of Plaintiffs' alleged damages.  To the extent Plaintiffs question the content of Rathe's report, Plaintiffs will have an opportunity to explore these issues through cross-

---

[143] R. Doc. 264.
[144] R. Doc. 264-1 at 1.  Rathe has over thirty years of experience in designing and building MRI suites and is an approved "turnkey construction" vendor with GE, Philips, Siemens, and Toshiba. R. Doc. 274-3.
[145] R. Doc. 264-1 at 1-3.
[146] R. Doc. 274 at 2.
[147] R. Doc. 274-2.
[148] R. Doc. 274-1 at 4-10.
[149] R. Doc. 274 at 3-4.

examination of Rathe and the presentation of Plaintiffs' retained expert in structural engineering. As such, Plaintiffs' motion to exclude Rathe is DENIED.

**11. Plaintiffs' Motion to Strike Jeffrey Charlet (R. Doc. 265)**

Plaintiffs seek to exclude the testimony of Philips' purported expert in building code application and enforcement, Jeffrey Charlet ("Charlet").[150]  Plaintiffs argue that Charlet is not qualified to testify as an expert in his designated field because: he does not hold any degrees in engineering; he has not been involved in any building projects as a contractor, other than his own home; he has not been involved in a project related to a facility that houses MRI equipment; he has never drawn plans for commercial construction; he has no expertise in Louisiana State Fire Marshal Codes or Regulations; and he has no expertise relevant to a helium vent pipe.[151]  Plaintiffs also argue that Charlet's opinions either are not relevant to the issues in this case or offer legal conclusions.[152]

Philips argues that Charlet is qualified to testify as an expert in the field of building code application and enforcement.[153]  Charlet is a certified International Code Council Building Official, who is registered with the Louisiana Uniform Construction Code Council.[154]  He worked as a code enforcement officer for thirty years in Jefferson Parish (where the facility is located), including fifteen years as a plan review supervisor.[155]  Charlet drafted a portion of the Jefferson Parish Building Code.[156]

Philips argues that Charlet's testimony is relevant to the construction of the MRI suite and Plaintiffs' alleged lost profits.[157]  Specifically, Philips contends that Charlet's testimony will

---

[150] R. Doc. 265.
[151] R. Doc. 265-1 at 1-2.
[152] *Id.* at 2-7.
[153] R. Doc. 275 at 1-2.
[154] R. Doc. 275-1 at 1.
[155] *Id.*
[156] R. Doc. 275-2 at 3.
[157] *Id.* at 3-4.

establish that the facility never met Jefferson Parish's building code requirements, and as a result, could not have operated "within the patient capacities that would be necessary to generate the income Plaintiffs claim to have lost for the time period at issue."[158] Further, Philips argues that all of Charlet's opinions that Plaintiffs contend are not reliable have a basis in fact, and he should be permitted to testify.[159]

Charlet's experience qualifies him to testify as an expert in the field of building code application and enforcement in Jefferson Parish, where Plaintiffs' facility is located. Further, Charlet's report demonstrates that his opinions in this case are relevant to the issues regarding the construction of the MRI suite and the cause of Plaintiffs' alleged damages. To the extent Plaintiffs question the content of Charlet's report, Plaintiffs will have an opportunity to explore these issues through cross-examination of Charlet and the presentation of countervailing testimony. As such, Plaintiffs' motion to exclude Charlet is DENIED.

### C. Philips' Motions to Exclude Untimely Expert Reports (R. Docs. 239 & 286)

#### 1. Legal Standard

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides that expert witnesses who are "retained or specially employed to provide expert testimony in the case" must submit expert reports that contain specified information. Fed. R. Civ. P. 26(a)(2)(B). A party must produce expert reports "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The "basic purpose" of Rule 26 is "preventing prejudice and surprise." *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994).

Rule 37(c)(1) of the Federal Rules of Civil Procedure states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) … the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure

---

[158] *Id.* at 4.
[159] *Id.* at 4-7.

was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Further, this Court's scheduling order states that "[t]he Court will not permit any witness, expert or fact, to testify or any exhibits to be used unless there has been compliance with this Order as it pertains to the witness and/or exhibits, without an order to do so issued on motion for good cause shown."[160] In determining whether a violation of Rule 26 is harmless or substantially justified, the Court considers: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 402 (5th Cir. 2003).

### 2. Philips' Motion to Strike Bryan Bordeman (R. Doc. 239)

Philips seek to exclude the testimony of Plaintiffs' purported expert in MRI RF shielding, Bryan Bordeman ("Bordeman").[161] Philips argues that Bordeman's testimony as to the contents of a report dated February 12, 2018, should be excluded because Plaintiffs failed to timely produce that report in accordance with Rule 26 of the Federal Rules of Civil Procedure.[162] The scheduling order in this case required Plaintiffs to produce to Philips all expert reports by October 4, 2018. Plaintiffs produced Bordeman's report on November 26, 2018.[163] Plaintiffs did not file a memorandum in opposition to Philips' motion.

Plaintiffs did not timely produce Bordeman's February 12, 2018 expert report to Philips and have offered no explanation for their failure to comply with the scheduling order or Rule 26. The timing and circumstances surrounding the tardy production of Bordeman's report raise concerns about gamesmanship and prejudice. Thus, Philip's motion is GRANTED, and Bordeman cannot testify as to any opinions contained in his February 12, 2018 report.

---

[160] R. Doc. 95 at 2.
[161] R. Doc. 239.
[162] R. Doc. 239-1 at 1-2.
[163] *Id.* at 2.

### 3. Philips' Motion to Strike New Expert Reports Produced by Plaintiffs (R. Doc. 286)

Philips moves to strike two documents produced by Plaintiffs, a purchase agreement for the MRI equipment and a drawing prepared by a land surveyor, arguing that they are untimely expert reports.[164] The scheduling order required Plaintiffs to produce expert reports by October 4, 2018, and these documents were produced on December 6, 2018.[165]

Plaintiffs have indicated that they will withdraw the purchase agreement and will not use it at trial.[166] Therefore, the motion is rendered moot as to the purchase agreement. Plaintiffs argue that the measurements prepared by the surveyor are not an expert opinion, but merely measurements, which are facts.[167] Plaintiffs argue that they will be prejudiced if the measurements are not admitted into evidence because Philips relied upon flawed measurements throughout the relevant time.[168] Plaintiffs agree to allow Philips to depose the surveyor, Gandolfo Kuhn ("Kuhn"), any time before trial.[169]

Considering Plaintiffs' representation that the measurements will not be introduced as an expert opinion, but rather simply as facts, and their offer to allow Philips to depose Kuhn before trial, Philips' motion to strike the survey is DENIED. However, Kuhn may not be tendered as an expert or give any opinions as to what his measurements may mean with respect to any issues in the case.

### D. Philips' Motion *in Limine* to Exclude Evidence Regarding Subsequent Remedial Measures (R. Doc. 238)

Philips moves to exclude evidence that, after the incident at issue in this case, it changed its specifications for the vibration pads from two layers to one layer.[170] Philips argues that this

---

[164] R. Doc. 286-1 at 2.
[165] *Id.*
[166] R. Doc. 322 at 2.
[167] *Id.* at 1.
[168] *Id.* at 3-9.
[169] *Id.* at 10.
[170] R. Doc. 238.

change constitutes a subsequent remedial measure and, as such, "any testimony, questioning, and evidence regarding vibration pads should be excluded from trial in this case."[171]

Plaintiffs argue that Philips' changing the specification from two-layer vibration pads to one-layer vibration pads is not a subsequent remedial measure because it has not been implemented on Plaintiffs' MRI equipment.[172] Plaintiffs contend that their MRI equipment still has the two-layer pads, and as a result, the MRI equipment is still moving.[173] Thus, Plaintiffs argue any investigations or recommendations regarding the pads are not subsequent remedial measures.[174]

Rule 407 of the Federal Rules of Evidence provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
>
> - culpable conduct;
>
> - a defect in a product or its design; or
>
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or – if disputed – proving ownership, control, or the feasibility of precautionary measures.

The purpose of Rule 407 is the "social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed. R. Evid. 407 advisory committee note to 1972 proposed rules. "The rule also seeks to ensure that negligence is properly determined according to what the defendant knew or should have known prior to the accident, not what the defendant knew as a result of the accident." *Adams v. Chevron USA, Inc.*, 383 F. App'x 447, 452 (5th Cir. 2010).

---

[171] R. Doc. 238-1 at 5.
[172] R. Doc. 281 at 4.
[173] *Id.*
[174] *Id.*

The pad change was made by Philips after the incident involving the MRI equipment sold to Plaintiffs in order to make the incident less likely to recur in Philips' MRI equipment, not merely to improve the product. As such, the field change order implemented a subsequent remedial measure and did not constitute an investigation into the incident involving the MRI equipment Plaintiffs purchased from Philips. In like circumstances courts in the Fifth Circuit have applied Rule 407, including its policy to encourage post-accident steps in furtherance of added safety, to exclude evidence of such steps to prove culpability. *See, e.g., Cox Operating, L.L.C. v. Settoon Towing, L.L.C.*, 2018 WL 3862072, at *1-2 (E.D. La. Aug. 13, 2018); *Davzat v. Weeks Marine, Inc.*, 2016 WL 3186900, at *2 (E.D. La. June 7, 2016). Nor can the issue of causation, as invoked by Plaintiffs, be used to frustrate the purposes of Rule 407. *See, e.g., Chesapeake La., L.P. v Innovative Wellsite Sys., Inc.*, 2015 WL 339022, at *2-3 (W.D. La. Jan. 23, 2015) (cautioning against admissibility of subsequent remedial measures when offered to rebut theory of causation, calling such arguments "semantic manipulation") (citing *Hardy v. Chemtron Corp.*, 870 F.2d 1007, 1011 (5th Cir. 1989)). These principles would seem to weigh in favor of excluding the evidence of the pad change, but the analysis of the issue does not end here.

In *Brazos River Auth. v. GE Ionics, Inc.*, a case involving breach-of-contract and breach-of-warranty claims, the Fifth Circuit noted that "a product can fail to perform as warranted without necessarily creating an 'injury or harm' as contemplated by [Rule 407," and even if "a 'lemon' could present a safety hazard, a party could forego a recovery for that safety-related 'injury or harm' and merely seek to recover the benefit of its bargain; the safety-related claim could be eliminated either voluntarily by a party narrowing its pleading, or involuntarily pursuant to rulings by the trial court." 469 F.3d 416, 428 (5th Cir. 2006). Here, Plaintiffs' claims are limited to breach-of-contract and warranty-like claims and do not include claims of negligence related to safety hazards associated with the MRI equipment. Thus, as the Fifth Circuit observed in *Brazos*,

the evidence at issue here does not go to the issue of negligence or culpability, but instead relates to whether the product sold worked as represented or warranted. Consequently, the words and the rationale of Rule 407 do not apply. Philips' motion *in limine* is DENIED.

### III.  CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Philips' motion for summary judgment regarding consequential damages waiver (R. Doc. 230) is DENIED WITHOUT PREJUDICE to Philips re-urging the motion if the jury finds that there is a contract incorporating Philips' standard "Terms and Conditions of Sale."

IT IS FURTHER ORDERED that Philips' motion for summary judgment to dismiss Plaintiffs' claims regarding the MRI's third-floor installation (R. Doc. 243) is DENIED.

IT IS FURTHER ORDERED that Philips' motion for summary judgment on claims regrading 5 gauss line and surgery suite (R. Doc. 245) is DENIED.

IT IS FURTHER ORDERED that Philips' motion to strike Tianliang Gu (R. Doc. 231) is DENIED.

IT IS FURTHER ORDERED that Philips' motion to strike Thomas Read (R. Doc. 233) is DENIED.

IT IS FURTHER ORDERED that Philips' motion to strike William Dixon (R. Doc. 234) is GRANTED as to the legal conclusion that Philips was negligent, and otherwise DENIED.

IT IS FURTHER ORDERED that Philips' motion to strike Donald Marks (R. Doc. 235) is GRANTED.

IT IS FURTHER ORDERED that Philips' motion to strike John Theriot (R. Doc. 236) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Jeff Englert (R. Doc. 261) is

DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Allen Ohlmeyer (R. Doc. 262) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Tobias Gilk (R. Doc. 263) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Richard Rathe (R. Doc. 264) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Jeffrey Charlet (R. Doc. 265) is DENIED.

IT IS FURTHER ORDERED that Philips' motion to strike Bryan Bordeman (R. Doc. 239) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion to strike Philips' reply memoranda (R. Doc. 299) is DENIED.

IT IS FURTHER ORDERED that Phillips' motion to strike new expert reports produced by Plaintiffs (R. Doc. 286) is DENIED as to the survey and DENIED as moot as to the purchase agreement.

IT IS FURTHER ORDERED that Philips' motion *in limine* to exclude evidence regarding subsequent remedial measures (R. Doc. 238) is DENIED.

New Orleans, Louisiana, this 2nd day of January, 2019.


_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE